The Honorable Thomas S. Zilly

1
2
3
4
5
6
7

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

8

9  DALE BROWN, et al,

10                      Plaintiff,

          v.

11

12  MASON COUNTY et al,

13                      Defendant.

    GRUMP VENTURES LLC,

14

15                      Petitioner,

          v.

16

17  MASON COUNTY,

                        Respondent.

No. 3:20-cv-05628-TSZ

**GRUMP VENTURES LLC'S LAND**
**USE PETITION PURSUANT TO**
**RCW CH. 36.70; AND FIRST**
**AMENDED COMPLAINT FOR**
**DAMAGES**

18

19

20

21

22

23

24

25

### I.   INTRODUCTION

1.1.   Petitioner/Plaintiff Grump Ventures, LLC ("Grump Ventures") by and through its undersigned counsel, files this Complaint and Petition pursuant to RCW Ch. 36.70C, the Land Use Petition Act ("LUPA") against Respondent/Defendant Mason County ("County"). This Complaint and Petition concerns a land use decision issued by Mason County rescinding a Form SM-6 ("SM-6") issued to Grump Ventures on June 30, 2017.

GRUMP VENTURES LLC'S LAND USE PETITION
PURSUANT TO RCW CH. 36.70C; FIRST AMENDED
COMPLAINT FOR DAMAGES - 1

**Van Ness**
**Feldman** LLP

1191 Second Avenue Suite 1800
Seattle, WA  98101-2996
(206) 623-9372

1.2.    Grump Ventures is a family-run limited liability company that has conducted gravel mining operations at its property since the 1950s. As part of its long-planned expansion of its mine, in 2017, Grump Ventures applied for and obtained a SM-6 from the County, which verified the County's approval of the proposed mining operations on the site. Over the following months, relying on the SM-6, Grump Ventures dedicated considerable resources and efforts towards its permitting applications.

1.3.    On January 2020, after ex parte meetings with community members opposed to Grump Ventures' project, the County suddenly revoked the SM-6 without prior notice to Grump Ventures. The County's revocation decision claimed that the mining use had been "abandoned for a period of more than two years," notwithstanding the County's knowledge of the ongoing permitting applications.

1.4.    On appeal, the County's Hearing Examiner affirmed the County's revocation decision. In reaching that decision, the Hearing Examiner misinterpreted the Mason County Code ("MCC" or "Code") and common law, improperly placed the burden of proof on Grump Ventures, exhibited bias and unfounded speculation, treated Grump Ventures differently from other property owners and applicants, and completely disregarded the facts presented by Grump Ventures, including evidence that the County failed to rebut. Grump Ventures asks this Court to review and reverse the County's decision; determine that the County's decision-making was illegal, arbitrary, and capricious; and award damages as a result of the injuries it has sustained through the County's actions.

GRUMP VENTURES LLC'S LAND USE PETITION
PURSUANT TO RCW CH. 36.70C; FIRST AMENDED
COMPLAINT FOR DAMAGES - 2



1191 Second Avenue Suite 1800
Seattle, WA 98101-2996
(206) 623-9372

## II.    PARTIES

**A.    Petitioner/Plaintiff and Petitioner/Plaintiff's Attorney**

2.1    Grump Ventures is the owner of the property at issue located within Mason County, and is the applicant for the land use permit at issue. Grump Ventures' mailing address is P.O. Box 190, Belfair, Washington 98528-0190.

2.2    Grump Ventures is represented by Brent Carson, Dale Johnson, and Sophia Amberson of Van Ness Feldman LLP, 1191 Second Avenue, Suite 1800, Seattle, Washington 98101. Grump Ventures may be contacted through the undersigned attorneys.

**B.    Respondent/Defendant Local Jurisdiction**

2.3    Mason County is the local jurisdiction that issued the decision at issue. The mailing address of the Auditor of the County is P.O. Box 400, Shelton, Washington 98584.

2.4    The decision-maker of the County who made the decision at issue is the Hearing Examiner for Mason County, Phil Olbrechts ("Hearing Examiner"). On information and belief, the mailing address of the Hearing Examiner is c/o Mason County Department of Community Development, P.O. Box 279, Shelton, WA 98584. The initial decision of Mason County is attached as **Exhibit A**; the Hearing Examiner's Revised Findings of Fact, Conclusions of Law and Final Decision ("Decision") issued August 11, 2020 is attached as **Exhibit B**.

**C.    Petitioner/Plaintiff's Standing**

2.5    Grump Ventures has standing under RCW 36.70C.060 as the owner, holder of property interests, and applicant concerning the property to which the Decision applies.

GRUMP VENTURES LLC'S LAND USE PETITION
PURSUANT TO RCW CH. 36.70C; FIRST AMENDED
COMPLAINT FOR DAMAGES - 3

**Van Ness
Feldman** LLP

1191 Second Avenue Suite 1800
Seattle, WA  98101-2996
(206) 623-9372

### D.      Jurisdiction and Venue

2.6      The Court has jurisdiction to review this Petition and Complaint pursuant to RCW 2.08.010, 7.16.160, and 7.24.010.

2.7      Pursuant to the provisions of the MCC the Decision is a "land use decision" appealable to this court exclusively via LUPA petition. *See* MCC 15.11.040. Under LUPA, a "land use decision" is "a final determination by a local jurisdiction's body or officer with the highest level of authority to make the determination, including those with authority to hear appeals," on applications for a governmental approval or on an interpretive or declaratory decision regarding the application to a specific property of zoning or other ordinances or rules. *See* RCW 36.70C.020. The Code provides that administrative decisions and administrative interpretations are appealable to the hearing examiner, and final decisions of the Hearing Examiner are appealable only via judicial appeal. MCC 15.11.010, -.040. This Petition is timely filed within twenty-one (21) days of the issuance of the Decision. *See* RCW 36.70C.040(3).

2.8      Venue is proper in Thurston County pursuant to RCW 36.01.050, which provides that actions against a county may be commenced in the superior court of either of the two nearest judicial districts. Thurston County is one of the two judicial districts nearest to Mason County.

2.9      This case was removed to the United States District Court for the Western District of Washington on September 9, 2020, pursuant to 28 U.S.C. § 1441(a) federal question jurisdiction.

3.0      The federal court has jurisdiction over Grump Ventures' state law claims under 28 U.S.C. § 1367(a) as these claims derive from a common nucleus of operative fact with Grump Ventures' federal law claims.

GRUMP VENTURES LLC'S LAND USE PETITION
PURSUANT TO RCW CH. 36.70C; FIRST AMENDED
COMPLAINT FOR DAMAGES - 4



1191 Second Avenue Suite 1800
Seattle, WA  98101-2996
(206) 623-9372

1

### III.   STATEMENT OF FACTS

2

3.1   Grump Ventures hereby incorporates all facts and allegations set forth in

3

the paragraphs above and below as if fully set forth herein.

4

3.2   Grump Ventures is a family-run LLC owned by Russell Scott and operated

5

with significant input and involvement by members of the Scott family. Since

6

approximately 1950, the Scott family has conducted gravel mining operations at the

7

project site, which consists of six contiguous parcels located along 4952 NE North Shore

8

Road in Belfair. The County has historically used the site for gravel mining operations,

9

and in recent years has used the site to stockpile materials.

10

3.3   In 2009, Grump Ventures purchased the six parcels that make up the site

11

from various members of the Scott family and consolidated the parcels into single

12

ownership. In 2017, Grump Ventures submitted an Application for Reclamation Permit to

13

the Washington State Department of Natural Resources. In the application, Grump

14

Ventures proposed to divide the project site into five mining and reclamation segments,

15

which would be worked sequentially in stages over a 100-year period.

16

3.4   As part of the Application for Reclamation Permit, Grump Ventures was

17

required to obtain a SM-6 for the subject parcels. A SM-6 is a form signed by a county or

18

municipality that verifies the county's or municipality's "approval of mining and of the

19

subsequent use of the mine site." WAC 332-18-01002. The SM-6 must be signed by a

20

responsible official from the appropriate jurisdiction.

21

3.5   On February 17, 2017, Grump Ventures submitted a SM-6 to the County

22

for approval. On June 30, 2017, the County issued a signed  SM-6 to Grump Ventures.

23

The form poses two questions to local zoning officials, quoted as follows:

24

> 1. Has the proposed surface mine been approved under local zoning
> and land use regulations?

25

GRUMP VENTURES LLC'S LAND USE PETITION
PURSUANT TO RCW CH. 36.70C; FIRST AMENDED
COMPLAINT FOR DAMAGES - 5

**Van Ness
Feldman** LLP

1191 Second Avenue Suite 1800
Seattle, WA  98101-2996
(206) 623-9372

2. Is the proposed subsequent use of the land after reclamation consistent with the local land use plan/designation?

For both questions, the County marked "yes." Additionally, the SM-6 issued to Grump Ventures included a handwritten note stating that Grump Ventures use was "[f]ound to be consistent with the diminishing assets doctrine."

3.6     After receiving the SM-6, Grump Ventures submitted applications for its mining proposal, including a Form SM-8A Application for Surface Mining Reclamation Permit and related materials to DNR, a Class IV General Forest Practices Application/ Notification for timber removal activities to the County, and a State Environmental Policy Act ("SEPA") checklist.

3.7     On June 22, 2018, the County issued and provided notice of a Mitigated Determination of Non-Significance ("MDNS") for the proposal. The SEPA checklist, which was published along with the MDNS, stated that the proposal's compatibility with existing and projected land uses and plans was pursuant to the "[l]ocal zoning code, [and] SM-6 from Mason County." To date, considerable resources have been dedicated toward Grump Ventures' permitting efforts. On information and belief, the County was aware of Grump Ventures' ongoing permitting efforts when it decided to revoke the SM-6.

3.8     Public records from the County show that around December 2019, certain members of a group called the Hood Canal Gravel Mining Opposition Association ("HCGMOA") requested private meetings with the County officials to discuss the SM-6. The County did not disclose to Grump Ventures that these meetings were occurring, and Grump Ventures had no notice that the County was undertaking a process to rescind the SM-6, depriving Grump Ventures of any opportunity to review or respond to HCGMOA's opposition.

GRUMP VENTURES LLC'S LAND USE PETITION
PURSUANT TO RCW CH. 36.70C; FIRST AMENDED
COMPLAINT FOR DAMAGES - 6



1191 Second Avenue Suite 1800
Seattle, WA 98101-2996
(206) 623-9372

3.9     Shortly after the meetings with HCGMOA members, on January 28, 2020, the County issued an administrative decision stating that "the County is rescinding the use of the SM-6," and that "any past surface mining has been abandoned for a period of more than two years." On February 10, 2020, Grump Ventures filed a timely appeal of the County's administrative decision to the Hearing Examiner, and HCGMOA intervened in the appeal.

3.10     During the prehearing process, the Hearing Examiner issued two summary judgment orders. The first concluded that the SM-6 certification served as a final land use decision that could not be collaterally attacked in this proceeding. Specifically, the Examiner concluded that the County could not revisit the validity of the finding in the SM-6 certification that the entirety of Grump's 66.5-acre mining site was a valid nonconforming use under the diminished assets doctrine as of the issuance of the certification on June 30, 2017. The second summary judgment order concluded that Grump Ventures' nonconforming use rights could be terminated by two years of cessation of use for any two-year period between July 1, 2017 and April 3, 2019. Ignoring well-established Washington common law regarding nonconforming uses and the diminishing assets doctrine, the Examiner further concluded that continued use required actual mining and gravel extraction, and that mining-related uses such as storage, stockpiling of materials, and the ongoing permitting efforts were insufficient to establish continued use. Finally, the Examiner concluded that Grump Ventures' intent to maintain its nonconforming use right was irrelevant.

3.11     The Hearing Examiner held a virtual open-record hearing over four days, on July 16, 22, 23, and 24, 2020. During the open record hearing, Grump Ventures provided testimony from five witnesses who testified regarding Grump Ventures' mining activities between July 1, 2017, and April 3, 2019. In particular, Grump Ventures

GRUMP VENTURES LLC'S LAND USE PETITION
PURSUANT TO RCW CH. 36.70C; FIRST AMENDED
COMPLAINT FOR DAMAGES - 7



1191 Second Avenue Suite 1800
Seattle, WA  98101-2996
(206) 623-9372

1    presented photos, business records, and testimony regarding mining activities that

2    occurred beginning in February and through April 2017, including the digging of test pits

3    and mining that occurred in April 2017.

4         3.12    The County and HCGMOA collectively provided testimony seeking to

5    prove that no such mining had occurred. However, as described further below, in many

6    instances the County and HCGMOA's testimony failed to refute Grump Ventures'

7    testimony, or at best presented conflicting testimony. Under Washington common law,

8    conflicting testimony is an insufficient basis for terminating a nonconforming use right.

9         3.13    Following the hearing, the Examiner issued the Decision on August 11,

10   2020, denying Grump Ventures' appeal. In the Decision, the Hearing Examiner

11   incorporated his prior summary judgment orders. The Examiner issued the Decision with

12   complete disregard of the facts presented by Grump Ventures. Among other issues, the

13   Examiner disregarded contemporaneous business records on the grounds that the records

14   were "manufactured for the appeal hearing," despite a total absence of evidence that the

15   records were manufactured; the Examiner failed to acknowledge evidence that directly

16   addressed the County and HCGMOA's claim that Grump Ventures' mining activities

17   were economically or practically infeasible; and the Examiner credited the testimony of an

18   "expert" who opined that no mining or vegetation removal had occurred on the property,

19   while ignoring unrefuted evidence showing that over 85,000 board feet of timber had been

20   removed from the property. The Examiner also exhibited bias and unfounded speculation

21   against Grump Ventures, treating Grump Ventures differently from other property owners

22   and applicants.

23        3.14    On October 1, 2020, Grump Ventures delivered a Notice of Claim and

24   attached Mason County Claim for Damages Form pursuant to MCC 2.148.060, *et seq.* and

25   chapter 4.96.010 RCW *et seq.* The County did not respond to Grump Ventures' Claim for

GRUMP VENTURES LLC'S LAND USE PETITION
PURSUANT TO RCW CH. 36.70C; FIRST AMENDED
COMPLAINT FOR DAMAGES - 8



1191 Second Avenue Suite 1800
Seattle, WA  98101-2996
(206) 623-9372

Damages within sixty (60) days, and accordingly pursuant to RCW 4.96.020, Grump Ventures may now bring tort claims against the County.

### IV.   STATEMENTS OF ERROR

4.1   Grump Ventures hereby incorporates all facts and allegations set forth in the paragraphs above and below as if fully set forth herein.

**A.   The Decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise. RCW 36.70.130(1)(b).**

4.2   The County's rescission of Grump Ventures' SM-6 was based on the County's conclusion that "any past surface mining has been abandoned for a period of more than two years." Ex. B at 1. MCC 17.05.016(a) provides, "If any nonconforming use of land and/or building is abandoned, or ceases for any reason whatsoever (including destruction of the building) for a period of two years or more, then any future use of such land and/or building shall conform to the provisions of this chapter."

4.3   The Decision was the result of several erroneous interpretations of the Code and of well-established Washington case law regarding nonconforming uses. The Decision's erroneous legal interpretations include, but are not limited to the following:

- The Hearing Examiner erroneously concluded that the Code required Grump Ventures to engage in the act of mining every two years. Under common law regarding nonconforming uses and the diminishing assets doctrine, Grump Ventures' activities, including but not limited to its ongoing permitting applications, maintenance of stockpiles and equipment, and maintenance of the pit's availability for use by contractors and by the County, were sufficient to continue the nonconforming use right.



1191 Second Avenue Suite 1800
Seattle, WA  98101-2996
(206) 623-9372

- The Hearing Examiner erroneously concluded that Grump Ventures' intent to continue mining operations was irrelevant to the abandonment inquiry, notwithstanding the requirement of intent established under the Code and common law.

- The Hearing Examiner erroneously considered evidence pre-dating the SM-6's issuance, even after the Examiner concluded that the SM-6 was a final, unappealed land use decision that could not be collaterally attacked and that established the existence and validity of Grump Ventures' nonconforming use right as of June 30, 2017. The Examiner's findings regarding Grump Ventures' use in the years prior to the SM-6's issuance amount to an improper collateral attack on the SM-6.

- While the Decision facially acknowledged that the County bears the heavy burden of proving abandonment, the Hearing Examiner applied the burden of proof erroneously. Among other things, the Examiner discounted Grump Ventures' testimony and evidence as self-serving without applying the same standard to the project opponents' testimony, who had a similar interest in providing self-serving testimony. As another example, the Examiner disregarded trucking slips maintained by a third-party trucking contractor on the grounds that the slips were not "independently verifiable." In applying such standards, the Examiner improperly placed a high burden of proof on the property owner, in contravention of well-established Washington case law.

GRUMP VENTURES LLC'S LAND USE PETITION
PURSUANT TO RCW CH. 36.70C; FIRST AMENDED
COMPLAINT FOR DAMAGES - 10



1191 Second Avenue Suite 1800
Seattle, WA  98101-2996
(206) 623-9372

1

2

**B.      The Decision is not supported by evidence that is substantial when viewed in light of the whole record before the court.  RCW 36.70C.130(1)(c).**

3

4

5

6

4.4      The Hearing Examiner's Decision credited the entirety of the County's and HCGMOA's evidence, but in doing so, the Examiner failed to acknowledge or even mention many key pieces of Grump Ventures' evidence that discredited or contradicted the County's and HCGMOA's evidence.

7

8

9

10

11

12

13

14

15

16

17

4.5      As one example, the Hearing Examiner relied on the HCGMOA's' expert's use of precise methodologies used to calculate quantities of extracted materials in mining operations. However, during cross, the expert readily admitted that he did not use such methodologies in his analysis for this case. Rather, the methodology the expert used was so unreliable that the expert failed to recognize any evidence of  logging of over 85,000 board feet of timber that had occurred in the subject property, despite Grump Ventures' submission of undisputed evidence that such logging had occurred. The expert's inability to recognize the drastic signs of logging, signs of which were visible even to the untrained layperson's eye, calls into question the expert's reliability and credibility and the Decision's reliance on the expert. The expert also provided conflicting testimony about the accuracy of his methods.

18

19

20

21

22

23

24

4.6      Other evidence that the Examiner failed to address in the Decision include evidence that directly addressed and rebutted the County and HCGMOA's claims that Grump Ventures' mining activities were physically or economically impossible. This evidence includes, but is not limited to, evidence regarding the speed of vegetation growth, the nonuse of the road where Grump Ventures dug test pits in 2017, the closure and unavailability of a nearby pit, and the unrefuted records of additional equipment brought into the pit on April 26, 2017. By failing to address significant portions of the

25

GRUMP VENTURES LLC'S LAND USE PETITION
PURSUANT TO RCW CH. 36.70C; FIRST AMENDED
COMPLAINT FOR DAMAGES - 11

**Van Ness Feldman** LLP

1191 Second Avenue Suite 1800
Seattle, WA 98101-2996
(206) 623-9372

evidence in the record, much of which was unrefuted, the Decision made findings that were not supported by substantial evidence.

**C.      The Decision is based on a clearly erroneous application of the law to the facts.  RCW 36.70C.130(1)(d).**

4.7      The Decision is a clearly erroneous application of the law, including but not limited to MCC 17.05.016(a) and common law regarding nonconforming uses and the diminishing assets doctrine.

**D.      The Decision violates Grump Ventures' constitutional rights.  RCW 36.70C.130(1)(f).**

4.8      The Decision, including but not limited to the emphasis placed on Grump Ventures' interest in its nonconforming use right, constituted a violation of Grump Ventures' right to substantive and procedural due process of law, equal protection of the law, and to be free from arbitrary, capricious and unlawful conduct. The errors include but are not limited to the Hearing Examiner's bias and speculation against Grump Ventures and the treatment of its appeal differently due to Grump Ventures' identity.

**E.      The Decision was based on unlawful procedure and failure to follow a prescribed process, and was outside the Hearing Examiner's authority or jurisdiction.  RCW 36.70C.130(1)(a), (e).**

4.9      The Examiner engaged in unlawful procedure, failed to follow a prescribed process, and acted outside the Examiner's authority or jurisdiction in issuing the Decision, including but not limited to the Examiner's consideration of evidence prior to the SM-6's issuance, resulting in a collateral attack on the SM-6's basis and being internally inconsistent with the Examiner's summary judgment ruling.

GRUMP VENTURES LLC'S LAND USE PETITION
PURSUANT TO RCW CH. 36.70C; FIRST AMENDED
COMPLAINT FOR DAMAGES - 12



1191 Second Avenue Suite 1800
Seattle, WA  98101-2996
(206) 623-9372

1

## V.     CAUSES OF ACTION

2

### A.     First Cause of Action: Land Use Petition – Chapter 36.70C RCW

3       5.1     Grump Ventures hereby incorporates all facts and allegations set forth in

4   the paragraphs above and below as if fully set forth herein.

5       5.2     Grump Ventures has alleged facts sufficient to demonstrate that the

6   Decision was based on unlawful procedure and failure to follow a prescribed process, is

7   an erroneous interpretation of the law, is not supported by substantial evidence when

8   viewed in light of the whole record, is a clearly erroneous application of the law to the

9   facts, is outside the Hearing Examiner's authority or jurisdiction, and violates Grump

10  Ventures' constitutional rights, under RCW 36.70C.130.

11      5.3     For these reasons, the Decision should be reversed and set aside.

12  ### B.     Second Cause of Action: Damages – Chapter 64.40 RCW

13      5.4     Grump Ventures hereby incorporates all facts and allegations set forth in

14  the paragraphs above and below as if fully set forth herein.

15      5.5     The County's acts and/or omissions set forth above are unlawful and

16  arbitrary and capricious and/or in excess of the County's lawful authority.

17      5.6     The County knew or should have reasonably known of the unlawfulness of

18  its acts and/or omissions.

19      5.7     The Decision limits the use of Grump Ventures' property in excess of

20  lawful authority. Without the SM-6, Grump Ventures is precluded from obtaining

21  necessary state permits, and prohibited from pursuing its proposed mining operations

22      5.8     The County's Decision is arbitrary and capricious and is resulting in

23  ongoing delay of Grump Ventures' project.

24

25

GRUMP VENTURES LLC'S LAND USE PETITION
PURSUANT TO RCW CH. 36.70C; FIRST AMENDED
COMPLAINT FOR DAMAGES - 13



1191 Second Avenue Suite 1800
Seattle, WA  98101-2996
(206) 623-9372

5.9     Grump Ventures has suffered actual, ongoing damages in an amount to be proved at trial, including but not limited to the costs associated with the ensuing permitting delay, attorneys' fees, and associated litigation costs as a result of the improper Decision.

5.10    As the prevailing party, Grump Ventures is entitled to recover costs and reasonable attorneys' fees, pursuant to RCW 64.40.020, in an amount to be proved at trial.

**C.     Third Cause of Action: Violation of 42 U.S.C. § 1983, Fourteenth Amendment of the United States Constitution – Procedural Due Process**

5.11    Grump Ventures hereby incorporates all facts and allegations set forth in the paragraphs above and below as if fully set forth herein.

5.12    Grump Ventures has cognizable property interests as an operator of a gravel mine, as a landowner, in its SM-6, in goodwill and reputation of its mining business, and in devoting land to legitimate uses which constitutes a protected property interest.

5.13    Grump Ventures has a cognizable liberty interest in its chosen occupation as a gravel mine.

5.14    By failing to give Grump Ventures notice of the rescission of the SM-6, and a fair, impartial, and unbiased opportunity to be heard with respect to the rescission, the County—acting under the color of state law, county ordinances, regulations, customs and usages of regulations and authority, and in violation of  42 U.S.C. § 1983—has and continues to deprive Grump Ventures of liberty and property without procedural due process in violation of the Fourteenth Amendment to the United States Constitution.

5.15    As a direct and proximate result of the foregoing Grump Ventures has been damaged in an amount according to proof at trial.

GRUMP VENTURES LLC'S LAND USE PETITION
PURSUANT TO RCW CH. 36.70C; FIRST AMENDED
COMPLAINT FOR DAMAGES - 14



1191 Second Avenue Suite 1800
Seattle, WA  98101-2996
(206) 623-9372

**D.      Fourth Cause of Action: Violation of 42 U.S.C. § 1983, Fourteenth Amendment of the United States Constitution – Substantive Due Process**

5.16    Grump Ventures hereby incorporates all facts and allegations set forth in the paragraphs above and below as if fully set forth herein.

5.17    Grump Ventures has cognizable property interests as an operator of a gravel mine, as a landowner, in its SM-6, in goodwill and reputation of its mining business, and devoting land to legitimate uses which constitutes a protected property interest.

5.18    Grump Ventures has a cognizable liberty interest in its chosen occupation as a gravel mine.

5.19    Grump Ventures also has a cognizable property interest in an impartial review of its appeal of the SM-6's rescission. The right to an impartial decision maker is a right implicit in the concept of ordered liberty. *Maytown Sand & Gravel, LLC v. Thurston Cty.*, 191 Wn.2d 392, 435, 423 P.3d 223 (2018).

5.20    The Hearing Examiner was not an impartial decision maker. Among other things, the Decision disregarded Grump Ventures' evidence without explanation, singled out and maligned Grump Ventures, exhibited bias, and made findings inconsistent with prior rulings. The County's and the Hearing Examiner's conduct, acting under the color of state law, county ordinances, regulations, customs and usages of regulations and authority, and in violation of 42 U.S.C. §1983, "shock[] the conscience and interfere[] with rights that are implicit in the concept of ordered liberty" thereby violating Grump Ventures' substantive due process rights under the Fourteenth Amendment of the United States Constitution. *Id.* at 430. Because decisions like this one (which was made in a climate of political pressure) are more susceptible to an abuse of authority, they "require[] a higher



degree of judicial scrutiny than is normally appropriate for administrative action." *Polygon Corp. v. City of Seattle*, 90 Wn.2d 59, 578 P.2d 1309, 1315 (1978).

5. 21   As a direct and proximate result of the foregoing, Grump Ventures has been damaged in an amount according to proof at trial.

**E.   Fifth Cause of Action: Violation of 42 U.S.C. § 1983, Fourteenth Amendment of the United States Constitution – Equal Protection Clause**

5.22   Grump Ventures hereby incorporates all facts and allegations set forth in the paragraphs above and below as if fully set forth herein.

5.23    The County, acting under the color of state law, county ordinances, regulations, customs and usages of regulations and authority, and in violation of 42 U.S.C. §1983, has intentionally treated Grump Ventures differently than other similarly situated mining operators in violation of the Fourteenth Amendment to the United States Constitution.

5.24   This differential treatment is without any rational basis, wholly arbitrary, and based on political pressure.

5.25   As a direct and proximate result of the foregoing, Grump Ventures has been damaged in an amount according to proof at trial.

**F.   Sixth Cause of Action: Negligence**

5.26   Grump Ventures hereby incorporates all facts and allegations set forth in the paragraphs above and below as if fully set forth herein.

5.27   The County had a duty to Grump Ventures to exercise its quasi-judicial authority as would a reasonably prudent Board of Commissioners and Hearing Examiner in like or similar circumstances.

GRUMP VENTURES LLC'S LAND USE PETITION
PURSUANT TO RCW CH. 36.70C; FIRST AMENDED
COMPLAINT FOR DAMAGES - 16



1191 Second Avenue Suite 1800
Seattle, WA  98101-2996
(206) 623-9372

5.28    The County breached its duty by rendering an intentionally unlawful, negligent, arbitrary, and capricious decision.

5.29    The County's breach is a direct and proximate cause of Grump Ventures inability to exercise its mining rights under the SM-6 prior to its unlawful rescission and affirmance.

5.30    As a result, Grump Ventures has suffered damages and the right to use and enjoy its property.

**G.    Seventh Cause of Action: Negligent Misrepresentation**

5.31    Grump Ventures hereby incorporates all facts and allegations set forth in the paragraphs above and below as if fully set forth herein.

5.32    The County represented, on several occasions, that the SM-6 was valid. The County also intentionally failed to inform Grump Ventures that it would attempt to unlawfully, willfully, and arbitrarily rescind the SM-6.

5.33    The County knew that the representations were false, or it was negligent in making the representations.

5.34    The County intended for Grump Ventures to act upon its representations.

5.35    Grump Ventures reasonably relied on the truthfulness of the County's representations.

5.36    As a result, Grump Ventures has suffered damages and the right to use and enjoy its property.

**H.    Eighth Cause of Action: Tortious Interference with a Business Expectancy**

5.37    Grump Ventures hereby incorporates all facts and allegations set forth in the paragraphs above and below as if fully set forth herein.

GRUMP VENTURES LLC'S LAND USE PETITION
PURSUANT TO RCW CH. 36.70C; FIRST AMENDED
COMPLAINT FOR DAMAGES - 17



1191 Second Avenue Suite 1800
Seattle, WA  98101-2996
(206) 623-9372

5.38    Grump Ventures had a valid business expectancy in its gravel resources, mining operation, and sale of gravel from the property.

5.39    The County had knowledge of Grump Ventures' business expectancy.

5.40    The County, through its rescission and affirmance of the rescission of the SM-6, intentionally induced or caused the termination of Grump Ventures' business expectancy.

5.41    The County's intereference was for an improper purpose or by improper means of succumbing to external political pressure.

5.42    The County's conduct proximately caused damages to Grump Ventures, including but not limited to, its business reputation and goodwill.

## VI.    REQUEST FOR RELIEF

Based on the foregoing, Grump Ventures requests the following relief:

1.   A ruling that Grump Ventures has met its burden of proof under one or more of the standards listed in RCW 36.70C.130;

2.   Reversal of the Decision;

3.   A ruling that Grump Ventures' nonconforming use right remains valid, and remand to the County for further proceedings;

4.   In the alternative, a ruling on the specific issues raised in this Petition, and remand to the County for further processing consistent with such rulings and issuance of a subsequent decision on the merits;

5.   An award of damages in an amount in excess of $118,726,200.00 lost in the current retail value of the total mineable material on the Property (not inclusive of retail value), to be further established at trial;

GRUMP VENTURES LLC'S LAND USE PETITION
PURSUANT TO RCW CH. 36.70C; FIRST AMENDED
COMPLAINT FOR DAMAGES - 18



1191 Second Avenue Suite 1800
Seattle, WA  98101-2996
(206) 623-9372

6.   An award of damages to business reputation and loss of goodwill, in the amount to be established at trial;

7.   An award of damages and attorneys' fees and costs as authorized under RCW 64.40 and 42 U.S.C. § 1988(b) and as otherwise allowed by law;

8.   For permission to amend the pleadings to conform to the proof; and

9.   For such other and further relief as may be just and equitable.

DATED this 24th day of February, 2021.

VAN NESS FELDMAN LLP



_____ _____
Brent Carson, WSBA # 16240
Dale N. Johnson, WSBA #26629
Sophia E. Amberson, WSBA #52528

1191 Second Ave., Suite 1800
Seattle, WA  98101T: (206) 623-9372
E: brc@vnf.com; dnj@vnf.com;
samberson@vnf.com

*Attorneys for Petitioner/Plaintiff Grump Ventures LLC*

GRUMP VENTURES LLC'S LAND USE PETITION
PURSUANT TO RCW CH. 36.70C; FIRST AMENDED
COMPLAINT FOR DAMAGES - 19



1191 Second Avenue Suite 1800
Seattle, WA  98101-2996
(206) 623-9372

# EXHIBIT A



# MASON COUNTY
# COMMUNITY SERVICES

Building, Planning, Environmental Health, Community Health

January 28, 2020

Russell Scott
Grump Ventures, LLC
PO Box 190
Belfair, WA 98528

**RE: Grump Ventures, LLC**

Dear Mr. Scott,

Mason County Community Services has made an Administrative Determination that Grump Ventures, LLC does not have a legal nonconforming use for surface mining in the Rural Residential 5 (RR5) zone on parcel numbers 22202-32-00000 and 22202-52-00026.

When the County made the determination to sign the Department of Natural Resource's "County Approval for Surface Mining (SM-6 Form)" on June 30, 2017, it was based on information shared with the Planning Department regarding past use of the subject parcels and interpretation of the Diminishing Assets Doctrine.

Since that time, the Department has received additional information that disputes the use of surface mining as a legal nonconforming use and challenges the application of the Diminishing Assets Doctrine. After consultation with legal counsel, the County no longer maintains that current use of the property is legal nonconforming surface mining and acknowledges the Diminishing Assets Doctrine does not apply to the subject properties. Therefore, the County is rescinding the use of the SM-6 Form by the DNR.

Current zoning does not support surface mining and any past surface mining has been abandoned for a period of more than two years.

Mason County Code (MCC) addresses nonconforming uses:

> *17.05.016 - Abandonment; reconstruction.*
>
> *(a)    If any nonconforming use of land and/or building is abandoned, or ceases for any reason whatsoever (including destruction of the building) for a period of two years or more, then any future use of such land and/or building shall conform to the provisions of this chapter. Upon written request of the property owner, the administrator shall grant one, one-year extension to the aforementioned two-year period.*

NOTICE OF REMOVAL OF ACTION - 24

Multiple dump truck loads of sand and gravel were taken from the Grump Venture's property in April of 2019. The County issued a Stop Work Order and required Grump Ventures, LLC either apply for an After-the-Fact Land Modification Permit (MCC 14.44) or receive a Surface Mine Reclamation Permit from the DNR. It was the County's understanding at that time that Grump Ventures, LLC was going to pursue a Reclamation Permit from the DNR.

If Grump Ventures, LLC wishes to proceed with a Surface Mine Reclamation Permit, the County will require the property to be rezoned from Rural Residential 5 (RR5) to Rural Natural Resource (RNR) before signing a new SM-6 Form. Rezone requests require a public hearing with the Planning Advisory Commission followed by another public hearing with the Board of County Commissioners prior to a final decision.  SEPA review is required for rezone requests.

Regardless of any future action or no-action, the County is waiving its previous requirement to apply for an After-the-Fact Land Modification Permit for the activity that occurred in April 2019.

If you have any questions regarding this Administrative Decision, do not hesitate to contact me. This administrative determination may be appealed according to Mason County Development Code, Title 15, Chapter 15.11 Appeals.

Sincerely,

Dave Windom, MSHS, Director Mason County Community Services

cc:     Bryan Massey L.G., Surface Mine Specialist, Department of Natural Resources
        Kell Rowen, Planning Manager
        Tim Whitehead, Deputy Prosecuting Attorney

# EXHIBIT B

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30

BEFORE THE HEARING EXAMINER OF MASON COUNTY

| | |
|---|---|
| RE:<br><br>Grump Ventures LLC<br><br>Administrative Appeal of Administrative Determination Rescinding Form SM-6 Interpretation | REVISED[1] FINDINGS OF FACT, CONCLUSIONS OF LAW AND FINAL DECISION |

## Summary

The Grump Ventures LLC ("Grump") appeal is denied.  Mason County's rescission of its SM-6 Certification on January 28, 2020 is sustained on the grounds that Grump lost its nonconforming use mining rights through cessation of use from April 3, 2017 through April 3, 2019.

This Decision should not be construed as extinguishing all of Grump's nonconforming use rights.  The SM-6 rescinded by Mason County was for the County's initial finding that Grump had nonconforming use rights to operate a 66.5 acre mine at levels of activity that trigger the need for a Department of Natural Resources reclamation permit.  That type of operation is a far cry from Grump's historical use of its property

_____

[1] The August 10, 2020 Final Decision was revised by the addition of three paragraphs to the end of Finding of Fact No. 14.  The three paragraphs clarify the determination that whether mining occurred in February/March was "somewhat questionable."  The information in those three paragraphs was a key part of the finding and had been unintentionally omitted from the August 10, 2020 decision.

Final Decision
PAGE 1

from at least 1995.  As outlined in the Findings of Fact, Grump operates what could be called a hobby mine, which is used sporadically and infrequently, with years of inactivity between minor incidents of excavation and mining related activities. There is a vein of case law that holds that such infrequent use is characteristic of many quarry operations. Since such periods of inactivity can exceed the time limits of nonconforming use termination clauses, courts have held that the time limits do not apply to them.

An important caveat to Grump's retention of nonconforming use rights, however, is that its protected use is generally limited to its historical use.  In short, Grump may have a nonconforming hobby mine, but it does not have a nonconforming 66.5-acre commercial mine.  Whether, and to what extent, Grump has such a nonconforming use is beyond the scope of this Decision.  The issue is just identified at this juncture to accurately define the scope of this Decision, which is to address the validity of the SM-6 rescission as it applies to the mining proposed in Grump's reclamation permit application.

The findings of this decision should also not in any way be construed as a judgment on the character or honesty of witnesses who participated in the appeal hearing. They are based upon the evidence presented into the record.  There are findings made that suggest that testimony provided by one or more Grump witnesses was not credible.  These findings are based upon a preponderance of evidence, which means there is still a reasonable possibility that everything the witnesses said is accurate.

In his closing, Mr. Whitehead correctly noted that the County was tasked with a very high burden of proof, establishing a negative, that no mining had occurred over a two-year period.  This burden was initially met by the testimony of Rick Glenn, Earl Iddings and Pat Byrne and several other neighbors.  Mr. Glenn is an undisputed expert in using aerial and terrestrial photographs to assess mining and forestry activity.  Mr. Glenn used numerous aerial and terrestrial photographs to find that no mining of any appreciable amount occurred on Grump's proposed mining area at least since 2012.  Mr. Glenn's assessments may not be as precise as he testified, as it does appear that he missed some logging in 2011 and there is no question he incorrectly identified the composition of a

Final Decision
PAGE 2

driveway.  However, even with these errors in judgment, overall the methodology used by Mr. Glenn and the evidence he presented in photographs during his testimony, in conjunction with neighbor observations, lead to the conclusion that no mining occurred between April 3, 2017 and April 3, 2019.

Mr. Glenn's observations were corroborated by the testimony of Earl Iddings and Pat Byrne.  Mr. Iddings lives adjacent to the Grump pit to the north, separated by a parking lot.  Mr. Byrne lives across North Shore Road from the entrance to the Grump pit.  Mr. Iddings can see into the pit area and hear the use of machinery in it from inside his home.  Mr. Byrne can also hear the use of machinery in the Grump pit from his home.  They both testified that they heard and saw the County's use of the pit in 2014 and 2015 and both heard and saw use of the pit by Peninsula Topsoil in 2019 (although Mr.  Iddings was away on vacation for a portion of the 2019 work).  Both Mr. Byrnes and Mr. Iddings testified that they saw and heard no mining activity on the Grump properties for periods of time that included April 3, 2017 through April 3, 2019.  The Intervenors provided Declarations from 14 households in the immediate vicinity who all stated they were not aware of and did not see or hear evidence of mining activity at the Grump Pit in 2017. As demonstrated by Grump counsel, the neighbors of the area generally lived on large lots with deep driveways with significant amounts of vegetation that buffered them from activity they could have seen or heard from the Grump property.  However, in toto, the large number of neighbors who heard and saw nothing corroborates the findings of Mr. Glenn, that no mining occurred in between April 3, 2017 and April 3, 2019.

In response to the evidence showing no mining activity in April 3, 2017 through April 3, 2019 Grump presented evidence on two instances of mining activity, specifically 50-60 cubic yards of gravel extraction on April 22, 2017 and the digging of two test pits in April or early May 2017.  More likely than not such activity did not occur.  From the evidence presented, it appears that mining activity that may have occurred in February 2017 was misrepresented by Grump witnesses as having been extended into April 2017.  The evidence suggests that those with an interest in the Grump mine didn't realize they

Final Decision
PAGE 3

needed to engage in mining activity in the two years prior to April 2019 until they received the County's SM-6 rescission in January 2020. This substantial business opportunity, potentially lost simply because mining was done in February 2017 instead of April 2017, would have seemed nonsensical and fortuitous at the time to persons associated with Grump. It would have been incredibly tempting to modify the facts just a little to extend the February mining activity just a few weeks into April. The evidence establishes more likely than not this is precisely what occurred.

The evidence establishing the absence of any activity in April is substantial, based upon independent observations of no mining activity and highly dubious evidence presented by Grump. Overall, a major problem with the evidence presented by Grump for all of its assertions in its 20-hour hearing was that none of the evidence was independently verifiable. Almost all of the documentation and testimony provided by Grump was made by people closely associated with the Grump business. Every single financial document and receipt presented by Grump was a document prepared by Grump or Peninsula Topsoil that could have been easily manufactured for the appeal hearing.

This evidentiary shortcoming was most apparent in Grump's alleged mining activity on April 22, 2017. A Grump witness stated that he had mined 30-60 cubic yards that day for delivery to a development at Timberline. Grump presented no invoice that would have submitted to the developers of Timberline for the materials delivered, no bank statement for receipt of any monies for such delivery and no cancelled check from the Timberline developer for payment. The only documentation Grump presented to prove that highly critical work on April 22, 2017 was an invoice showing that a loader had been moved off the Grump pit on April 26, 2017.

In addition to the highly dubious documentation supporting claims of mining on April 22, 2017, it is also improbable that anyone doing the mining would have found it feasible. Jason Johnson testified that the material he excavated from the Grump pit would have cost $0.50 to $1.00/cubic yard. Therefore, the 50-60 cubic yards that he mined was only worth at most $60. Even if Peninsula Topsoil was able to acquire it for free from

Final Decision
PAGE 4

the Grump pit, it wouldn't have made any economic sense to get it there because the trucking cost was $2/minute. Peninsula Tops Soil had a mine right next to the Timberline Development as well as one three miles away from the development where it could have obtained the gravel. The Grump pit was six miles away from the development and it took 5 to 6 truckloads to haul the material to the development site.

The testimony of Intervenor witnesses added further implausibility to the April 22, 2017 mining activity. Earl Iddings, who owns a construction company with several pieces of mining equipment, testified that gravel would not be extracted from the pit in the manner testified by the Grump witness. The Grump witness testified that he "pulled" gravel from the face of the gravel pit bank behind some stream rock stockpiles. As testified by Mr. Iddings, the embankment in question is near vertical with tall trees and exposed roots overhanging the top. Any removal of gravel from that embankment face could result in the trees toppling onto the person engaged in the excavation and for that reason violates mining regulations. Finally, there's also the testimony of Mr. Glenn that he observed no mining in that area and that the amount of vegetation in pictures taken shortly after the alleged mining showed a large amount of vegetation that was not consistent with what would have had to be cleared for the alleged mining.

Neighbors who visited the site made observations similar to those of Mr. Glenn. Mr. Iddings who stated he hadn't seen signs of excavation in either 2017 or 2018 and that in both cases he witnessed vegetation overgrowth that appeared consistent from year to year; Mr. Anspach was at the pit and took pictures on July 14, 2018 and noted the area was then covered in vegetation; and Mr. Byrne who stated he has been on the property about once per year and was on the property in June of 2018 and saw no sign of equipment use in the prior three years. Each man stated they had never witnessed any excavation in 2017 and saw just overgrown vegetation.

The issue of whether the test pits were dug after April 8, 2017 is not as clear cut as the mining work for the Timberline development. The Grump witness testified that he did that work in late April or early May of 2017 in the area of a logging road. There are

Final Decision
PAGE 5

two sources of evidence that render this testimony dubious. First, Mr. Glenn had looked closely at this area during the appeal hearing and found that brush had steadily grown in this logging area and made it impassable by April/May of 2017. His observations were confirmed by the testimony of Earl Iddings, who noted that from his site visits starting in 2005-6 and then twice or three times per year from 2015 forward, he found the site of the test pits increasingly overgrown and eventually impassable, even to pedestrians. As testified by Mr. Glenn, if mining equipment had been brought up to that area in late April or early May 2017, the road vegetation would have shown up as cleared in the 2018 photographs he looked at.

Further, as testified by Mr. Iddings, test pits aren't dug in the middle of logging roads because they have a high potential of undermining them, either by tapping into a water table and flooding the road or simply by creates soft spots in the road that eventually undermine their utility. As testified by Mr. Iddings, there were plenty of places to dig the test pits on the side of the road, it made no sense to do them in the road. For these reasons, along with the fact that the April 22 testimony from the same witness was very likely not accurate and the strong incentive to modify evidence of mining activity after April 8, 2017, the preponderance of evidence is found to establish that no test pits were dug in April or May 2017.

## Exhibits

See Appendix A.

## Findings of Fact

**Procedural:**

1.    Reclamation Permit.    In 2017, Grump Ventures submitted an Application for Reclamation Permit to the Washington State Department of Natural Resources ("DNR").

Final Decision
PAGE 6

2.    <u>SM-6 Form</u>.    As part of the reclamation period review process, DNR requires local zoning officials to fill out an "SM-6" form.    The form poses two questions to local zoning officials, quoted as follows:

> 1.    *Has the proposed surface mine been approved under local zoning and land use regulations?*
> 2.    *Is the proposed subsequent use of the land after reclamation consistent with the local land use plan/designation?*

The form provides a check box of "yes" or "no" for this inquiry.    The form requires no other information from local officials.

3.    <u>SM-6 Certification</u>.    On June 30, 2017, the Mason County Director of Community Services filled out the SM-6 form for Grump's reclamation permit application.    The Director checked the yes box to both questions of the form with a footnote providing "*[f]ound to be consistent with the diminishing assets doctrine*."    This document is referred to as the "SM-6 Certification" in this Decision.

4.    <u>SM-6 Rescission</u>.    On January 28, 2020, the Director of Community Services issued a self-described "administrative determination," referred to in this Final Decision as the "SM-6 Rescission" The SM-6 Rescission stated that based upon new information the County was "*rescinding the use of the SM-6 Form by the DNR*."    As legal grounds for the rescission, the SM-6 Rescission quoted MCC 17.05.016.    MCC 17.05.016 provides that legal nonconforming use status can be lost through two years of abandonment or cessation of use for any reason.    The SM-6 Rescission provided that it was subject to administrative appeal under Chapter 15.11 MCC, Administrative Appeals.

5.    <u>Appeal</u>.    Grump filed an appeal of the SM-6 Rescission on February 10, 2020.    The appeal was limited to asserting that LUPA case law prohibits Mason County from re-assessing the validity of the SM-6 certification in its SM-6 Rescission.    The appeal also took the position that Mason County has the burden to prove that Grump had to have intended to abandon its use for two years to lose its nonconforming use status due to two-year abandonment under MCC 17.05.016.    Grump asserts it had no such intent.

Final Decision
PAGE 7

6.   <u>Motion to Intervene</u>.   On February 27, 2020, the Hood Canal Gravel Mine Opposition Association ("Intervenors") filed a motion to intervene.   The motion was granted by order dated March 26, 2020.

7.   <u>Summary Judgment</u>.   Two summary judgment orders were issued in this appeal. The first held that the SM-6 certification served as a final land use decision that could not be collaterally attacked in this proceeding.   Specifically, this proceeding could not revisit the validity of the finding in the SM-6 certification that the entirety of Grump's 66.5-acre mining site was a valid nonconforming use under the diminished assets doctrine as of the issuance of the certification on June 30, 2017.   The second summary judgment motion held that Grump's nonconforming use rights could be terminated by two years of cessation of use for any two-year period between July 1, 2017 and April 7, 2019[2].

8.   <u>Hearing</u>.   The Grump appeal hearing was held over four days on July 16, 22, 23 and 24, 2020.   An exhibit list was distributed for comment and responses from the parties were received on August 7, 2020.   The hearings were held virtually on the Zoom application.   Hearing participation was limited to Grump, Mason County and the Intervenors.

**Substantive:**

9.   <u>Grump Properties</u>.   As identified in Grump SM-6 form, Ex. C-1, the Grump mining properties are 66.5 acres in total area.   As concluded in a memo by Mason County Planner Michael MacSems, an existing gravel pit extends over five parcels in this 66.5-acre area, totaling only 1.18 acres in area.   See Ex. I-118.   The remaining 66.5 acres is undeveloped with some logging roads.   See Ex. I-1.

10.   <u>Relationship of Grump Witnesses</u>.   Grump is owned and operated by Russell Scott.   Several persons who testified have the last name of Scott.   All such persons are within the extended family of Russell Scott.   The remaining Grump witnesses are Johnsons, who are also all related to each other.   One or more Johnsons own and operate

---

[2] Evidence presented in this hearing clarified that mining activity occurred at the Grump pit as early as April 4, 2017.   Consequently, this Decision modifies the end date from April 7, 2019 to April 3, 2019.

Final Decision
PAGE 8

Peninsula Topsoil and Olympic Trucking. The Johnsons and the Scotts have been family friends and have been working in business together for decades. Russell Scott testified that they shared a household when he was a child. Jason Johnson owns Olympic Trucking. His uncle, Jack Johnson, owns Peninsula Topsoil.

11.    <u>County Stop Work on April 8, 2019 Excavation</u>. Grump authorized extensive extraction work at its pit around April 4, 5 and 8, 2019 as documented in trucking slips (Exhibit A-7). Kell Rowan, Mason County Planning Manager, issued a verbal stop work order on April 8, 2020 and mining ceased at that point. The second summary judgment ruling in this appeal erroneously presumed a written stop work order had been issued, but Ms. Rowen in her testimony identified it was only verbal. The verbal order is not a code enforcement tool identified in the MCC, but rather was used by Ms. Rowen in lieu of issuing a formal written stop work order that is authorized by the MCC.

12.    <u>General Historical Use Infrequent and Sporadic</u>. Overall, historical use of the Grump pit has been infrequent and sporadic, likely significantly less than once per every two years since at least 1995.

The Grump pit appears to have been created in the 1940s to provide fill for the development of waterfront lots. In support of a favorable finding in Grump's SM-6 form, Grump submitted a "green file" to Mason County that documented the historical use of the property. Letters in the file outlined that the pit had been operated in the 1940s through 1960s, with undated photographs depicting mining and logging activity that appear to be decades old. See Ex. C-9. None of the photographs appear to depict any mining within the last twenty years. Earl Iddings testified that the pit had been originally dug to provide fill for the development of waterfront lots in the area and Russell Scott testified that the pit had been used to provide fill for 100 bulkheads in the area.

1995 appears to be the latest the mine was regularly used based upon comments made by Russell Scott in a July 2018 meeting with Jack Johnson, Earl Iddings and Brad Carey. Earl Iddings and Brad Carey are project opponents and live near the project site. According to the testimony of Carey and Iddings, Russell Scott and Jack Johnson stated

Final Decision
PAGE 9

1     there had been active mining in the 1950s and 1960s but no active mining since 1995.  In

2     surebuttal Russell Scott testified he never said there was no mining in the pit since 1995.

3     Mr. Scott testified there have been contractors in there since then.  He stated some of

4     those contractors put in curtain drains on his property in the 1990s and in exchange he

5     gave them access to the pit.  There have been other people in and out of there was well

6     over the years.  Rich Moore was another person in there.  Mr. Scott stated that the

7     County's always been in there.  Prompted from Ms. Clark, Mr. Scott also confirmed there

8     was work in 2017 as well.

9         The differing accounts of the 1995 statements appear most likely to be based upon

10    a miscommunication of what level of mining was conducted since 1995.  Mr. Carey and

11    Mr. Iddings were not very precise about what Mr. Scott and Mr. Johnson said about 1995.

12    Mr. Carey testified that at the July, 2018 meeting Mr. Scott and Mr. Johnson were of the

13    impression that the Grump mining in the 1950s and 1960s was sufficient to permanently

14    set their nonconforming use status. Under this understanding, they would have been

15    comfortable in disclosing that the mining was no longer of that high intensity after 1995,

16    believing such an admission would not jeopardize their nonconforming use rights.  Mr.

17    Scott knew about at least a couple instances of minor mining activity that has occurred

18    since 1995 and would not have said mining ceased entirely.  At the same time, Mr. Carey

19    and Mr. Iddings would likely not manufacture the 1995 date in its entirety.  The most

20    likely explanation is that Mr. Scott and Mr. Johnson had disclosed that the high level of

21    mining activity that they believed permanently set Grump's nonconforming use rights

22    had abated by 1995.

23

24         A documented history of regular and continuous mining in the Grump pit since

25    1995 would have gone a long way in corroborating Grump's position that mining

26    occurred in April 2017.   Despite this, the administrative record only contains

27    documentation and testimony identifying four specific instances of activity since 1995.

28    Grump showed a photograph in 2012 showing a loader in the pit operated by Richard

29    Moore and provided testimony that Mr. Moore mined the pit at that time.  A County

30

Final Decision
PAGE 10

witness, Richard Larue, testified that the pit was used by Mason County in 2014 and 2015 to store stockpiles of chip seal and stream bed excavation. Mr. Larue testified that the County did not do any excavation of the Grump pit. Grump presented trucking slips for alleged work done in February through April 2017. Ex. A-6. It is also uncontested that Grump did significant excavation of the pit in April 2019, which was shut down by verbal order of Mason County.

What is particularly revealing in Russell Scott's surrebettal on the subject of his 1995 statement is that he struggled to find any instances of repeated mining after 1995. When pressed by his own attorney as to what mining activity had occurred at the Grump pit since 1995, he could only come up with the mining identified in the preceding paragraph and some additional mining he authorized some contractors to do in 1995 in exchange for installing curtain drains on his property.

In the green file, Scott and Johnson witnesses generally spoke of regular mining occurring within the last few years, but identified no specific instances except for seeing hauling trucks at the mine on one or two occasions. Undated photos of mining activity are included in the file but given the antiquated nature of the vehicles in those photographs, they are clearly decades old, with several labelled as "my old pit pics." Kari Scott testified that some gravel from the pit was used for her driveway, but such a minor activity likely doesn't qualify as mining.

As previously noted, to establish that mining had occurred in 2017 it would have clearly been in Grump's interest to establish regular and continuous mining activity in years prior. This would have been easy to do by a combination of tax records and bank statements. Yet the record contains virtually no documentation or any concrete evidence of any mining activity prior to 2017 except for the Moore work in 2012, the County's stockpiling in 2014-15, and the mining in 1995 authorized as payment for installing curtain drains. From this information, it is concluded that the preponderance of evidence

Final Decision
PAGE 11

1  establishes that from 1995 through 2017 the Grump pit was used infrequently and

2  sporadically, with periods of inactivity often extending for several years at time.[3]

3  13.    Glenn and Neighbor Testimony Establish Prima Facie No Mining.  The testimony

4  of Rick Glenn and neighboring property owners establish a prima facie case of no mining

5  activity at the 66.5-acre Grump site between 2015 and 2018.

6     Rick Glenn is an undisputed expert in interpreting aerial and terrestrial

7  photographs to assess mining and forestry activity.   Using aerial and terrestrial

8  photographs, Mr. Glenn concluded that the 66.5-acre Grump site has not been logged

9  since 1989, that the perimeter of the Grump pit has not moved since 2000 and that no

10  gravel has been extracted from the pit since 2012.  Glenn Testimony, 7/21/20.  Mr. Glenn

11  stated that he would be able to see any gravel extraction exceeding 18.5 cubic yards,

12  assuming it wasn't a level extraction of a few inches over a large area.  Glenn Testimony,

13  7/23/20.

14     Mr. Glenn is a forester. He worked for the US Forest service from 1976-1979. He

15  has worked in aerial photogrammetry since 1979 with DNR. He's worked with

16  photogrammetry for WSDOT, DNR and Arizona DOT. He has extensive experience in

17  aerial photo interpretation. He's used aerial photography to determine how much material

18  was in a pit before and after excavation to determine how much material was available

19  and how much was used by a road project. This was used as a double check on materials

20  invoiced by contractors. Mr. Glenn testified photogrammetry is so accurate it is rarely

21  disputed.

22

23

24

25  _____

26  [3] Throughout the course of the appeal proceedings Grump has objected to any consideration of evidence
prior to the issuance of the SM-6 certification on the basis that such consideration would be an unpermitted
27  collateral attack on the SM-6 determination that the Grump mining operation was a valid nonconforming
use as of the date of issuance of the certification.  However, there are no specific findings or conclusions
28  issued as part of the SM-6 certification except for a reference to the diminished assets doctrine.  Beyond
application of the diminished assets doctrine, it is unknown what facts or law the County found pertinent
29  in making its SM-6 certification, so there is no basis to conclude that findings on issues such as periods of
mining inactivity are inconsistent with the SM-6 certification and hence qualify as a collateral attack on
30  that certification.

Final Decision
PAGE 12

1    Mr. Glenn heightened the accuracy of his analysis by using "stereo" images, that
2    involved scaling photographs from different time periods and then superimposing them
3    to see if there were any changes in topography or elevation.   Overall, Mr. Glenn's
4    experience, technique and methods were credible.

5    Although credible, Mr. Glenn's observations were not found to be as 100%
6    accurate as he claimed during his testimony.   This is due to a couple likely mistakes in
7    observation identified in evidence presented by Grump.   Mr. Glenn was adamant that no
8    logging had occurred since 1989 in the entire Grump 66.5 acres.   He stated his
9    observations would have caught both selective logging and logging along the logging
10   roads of the Grump site.   Mr. Glenn stated that the only logging he would miss are trees
11   removed from clumps of trees where the remaining canopy had time to fill in canopy
12   spaces left by the tree removal.   Yet Russell Scott acquired a forest practices permit to
13   log 85,000 board feet within Grump's 66.5 acres in 2011.   Mr. Scott testified that he
14   logged 85,000 to 100,000 board feet with this permit. Mr. Scott did not provide any
15   documentation evidencing this logging, such as sales or trucking receipts.   It's possible
16   that Mr. Scott acquired a forest practices permit, then didn't use it and then later testified
17   under oath that he did use it.   That scenario, however, appears unlikely.   More likely, Mr.
18   Glenn missed the logging of 85,000-100,000 board feet on the 66.5 acres owned by
19   Grump.

20   Mr. Glenn also incorrectly identified the surface of the Port of Allyn parking lot
21   as asphalt.   It is undisputed from the testimony of Russell Scott and Earl Iddings that the
22   surface is black lava rock.   Mr. Iddings testified that from the air black lava rock looks
23   the same as asphalt.   However, Mr. Glenn was adamant when he initially testified on the
24   subject that the surface was asphalt.

25   Although Mr. Glenn's observations weren't 100% accurate, his stereo imaging of
26   photographs taken of the Grump pit were meticulous.   His methodology and his
27   experience still create a high degree of confidence in his findings.   The gravel pit area
28   was the central focus of his investigation and involved a much more limited area, less

Final Decision
PAGE 13

than two acres, than the 60+ Grump acres he reviewed for logging. His findings on the pit are taken as more credible than his findings on the logging. If logging did indeed occur as testified by Mr. Scott in 2011, that logging is not found to significantly undermine Mr. Glenn's conclusions, but does leave more room to doubt Mr. Glenn's findings in questionable circumstances.

One pertinent point regarding Mr. Glenn's findings is that it's not clear how current they are. Mr. Glenn was not clear about the end date to his conclusion that no mining has occurred on the Glenn site. The photographs he reviewed during his testimony only went up to June 2018. In the absence of any other evidence in the record, Mr. Glenn's findings on no excavation are only taken to apply for the time period from 2012 through June 2018.

Mr. Glenn's comments were corroborated by the observations of area residents. Pat Byrne lives directly across North Shore Road from the Scott property driveway. He's owned various pieces of equipment including excavators, dump trucks, and front loader tractors. Mr. Byrne testified from the time he purchased his property in 1992 until 2018, he'd seen no continuous mining activity on the property. He took a series of pictures of the Scott Pit property in June 2018. At the time, he saw no signs of heavy equipment use in the area in the prior three years. He stated he was at home during the County chip seal operations in 2014-2015. He witnessed trucks coming and going. Both times during the activity during 2014-15 and in April 2019 he observed and heard activity from the site. He stated the activity was "almost visceral when those trucks come, it's a cacophony that could wake the dead at times it gets very, very noisy". He did not testify to noticing the 2012 mining activity conducted by Moore. Therefore, it is possible Mr. Byrne might have missed mining of a similar scale in 2017.

Mr. Earl Iddings owns a construction business and lives adjacent to the upland portion of the Scott property. He testified the only time he's observed excavation activity on the Scott property since 2015 was in 2019.

Final Decision
PAGE 14

1       In total, the Intervenors provided Declarations from 14 households in the
2   immediate vicinity who all stated they were aware of the County's activities in 2014-5
3   and of the 2019 mining activity but were not aware of and did not see or hear evidence of
4   mining activity at the Grump Pit in 2017.   (Ex. I-93, I-94, I-95, I-96, I-97, I-98, I-100, I-
5   101, I-102, I-103, I-104, I-105, I-106 and I-107). Mr. Larue, the County Roads Supervisor
6   testified the only activity he'd seen on the site was the County's own activity and the
7   2019 mining. Mr. Larue has been driving by this pit multiple days per week every year
8   for the last 15 years.

9   14.   <u>February 2017 Mining Questionable</u>.  Grump witnesses alleged some significant
10  extraction activity in January through March 2017.   The evidence is somewhat
11  questionable that this mining occurred.
12
13      One major discrepancy in the evidence is that the amount of mining in 2012 at the
14  pit by Moore is similar to that allegedly mined in February through April, 2017, yet the
15  Moore excavation was clear to Mr. Glenn's review of aerial photographs but the 2017
16  mining was not. Mr. Russell Scott testified that in 2012, Mr. Moore had removed about
17  200 cubic yards of material. In comparing the 2011 to 2013 Aerial Photos (Exhibits I-3,
18  I-4, I-66 and I-67), Mr. Glenn found there is an obvious difference in the amount of
19  material on the pit floor. There is far more material hummocked at the pit face and on the
20  pit floor in 2011 than in 2013 where the pit floor appears to have been leveled.

21      Jason Johnson alternately testified Olympic Trucking hauled either 50-60 cubic
22  yards or 50-100 cubic yards out of the Scott Pit in February, 50 to 100 cubic yards more
23  through March of 2017 and another 50-60 cubic yards in April 2017. Cumulatively, the
24  total amount of yardage excavated from the pit would have been approximately 150-220
25  cubic yards of material, which is comparable to the approximately 200 cubic yards
26  extracted by Moore in 2012.  Despite allegedly being similar in scale to the Moore
27  excavation in 2012, Mr. Glenn found no evidence of extraction from 2016 to 2018. It is
28  recognized that Mr. Glenn stated that he may not see excavations less than five feet deep
29  and Russell Scott testified that the 2017 excavation was two to three feet deep, but the
30

Final Decision
PAGE 15

fact remains that the Moore work was clearly visible to Mr. Glenn, and that involved similar amounts of material.

There is also testimony from various parties that were in the pit shortly after the alleged excavation activity in February and March of 2017 and of surrounding neighbors. Assuming the alleged mining activity did take place in 2017, at between 150 and 220 cubic yards of material, one would expect there would have been 15-20 trucks leaving the site. As noted above in Finding of Fact No. 13, several parties were in the pit on or after March or April of 2017. Of these, the most compelling is Solene who stated he was in the pit in either late March or early April of 2017 when he got lost surveying his own property. Mr. Solene stated there was no equipment of any kind on the property during his visit in 2017. He noted in fact that if there'd been equipment on the site, it might have cleared up his confusion as to the purpose of the chip seal. The property was overgrown, showed no signs of excavation and looked the same from 2017 to his later visits in 2018. Jason Johnson stated the loader had been brought into the pit in February 2017 and later removed on April 22, 2017 (Ex. A-6, Invoice #35277). Mr. Johnson did not provide a truck slip showing the date the loader was brought to the site. If the loader was indeed on the property the whole time, Mr. Solene would have seen it.

Others who visited the property and found no signs of recent excavation were Mr. Iddings who stated he hadn't seen signs of excavation in either of his May 2017, December 2017 visits or later in 2018 and that in both cases he witnessed vegetation overgrowth that appeared consistent from year to year; Mr. Anspach was at the pit and took pictures on July 14, 2018 and noted the area was then covered in vegetation; and Mr. Byrne who stated he has been on the property about once per year and was on the property in June of 2018 saw no sign of equipment use in the prior three years. Each man stated they had never witnessed any excavation in 2017 and saw just overgrown vegetation. The 2009 – 2016 progression is useful in that the vegetation is completely overgrown in 2009 (Exhibit I-73), whereas the useable area of the gravel pit floor is greatly expanded in 2012 with large amounts of materials against the pit face and immediately adjacent to it on the

Final Decision
PAGE 16

pit floor (Exhibit I-74). Ground level vegetation and vegetation on the pit face have been cleared as part of the 2012 excavation. The vegetation on the pit wall on the northeast portion of the pit appears to have grown, but not significantly between 2016 and 2018 (Exhibit I-75 and I-76).

The Intervenors presented declarations for multiple neighbors surrounding the Grump pit. Each stated that other than the County work in 2014-2015 and the 2019 mining activity, they knew of no other mining activity from 2015 to 2019 (See Finding of Fact No. 13). Despite being what Mr. Byrne referred to as a 'visceral' noise, none of these nearby neighbors detected mining activity in 2017 and never saw mining equipment enter or exit the site.

As evidence of the mining in February 2017, Grump presented a photo and testimony about a lowboy that got stuck on North Shore Road as it was trying to enter the Grump pit.  A lowboy is a type of trailer used for hauling heavy equipment. Jason Johnson testified Peninsula Topsoil had widened the mine entrance drive in 2019 to allow access for a lowboy to deliver and remove mining equipment. Several Grump witnesses attested to a lowboy getting stuck at the mine entrance when it high centered and blocked North Shore Road for 45 minutes to an hour. Jack Johnson stated he couldn't remember if the lowboy got stuck in 2017 or 2019. Jason Johnson dated he did recall hearing about a lowboy getting stuck, but he wasn't working the site at the time. Jason Johnson stated the picture he'd seen (Ex. A-11) was a lowboy but he couldn't tell when the picture was taken. He speculated the lowboy got stuck in 2017 because the driveway had been improved in 2019. He stated they'd had difficulty getting the lowboy on and off the site in 2017 and that they'd had to load and unload on the asphalt road (North Shore Road). Russell Scott suggested but did not state that the lowboy was stuck prior to 2019. A February 13, 2017 diary entry from Kari Scott, Mr. Scott's mother, stated that the Johnsons were moving a lowboy into the pit and got stuck (Ex. A-23). None of the parties who were involved in the alleged work were either present on site or able to provide a specific year. No immediate neighbor recalls the lowboy getting stuck in the mine

Final Decision
PAGE 17

entrance in 2017 and no pictures were presented to document this claim by Grump. The Belfair station of the Mason County Sheriff had no report of road closure that day. Melissa Seals of the Mason County Sheriff's Office stated they had no record of a blockage on North Shore Road between February 10 and February 15, 2017 though it is common for a road blockage of any duration to be reported to the Sheriff's Office and an officer sent to the scene.

It is also noteworthy that in the "green file" referenced in Finding of Fact No. 12 as being submitted to the County on February 17, 2017, Grump didn't mention the February 14, 2017 work done just three days before.

Although the County and Intervenors presented compelling evidence that no mining occurred in February, 2017, Grump presented some significant evidence to the contrary. Most notably, Grump presented two pictures, Ex. A-4 and A-5, which show brush clearing and/or excavation work at the Grump pit. These pictures were uploaded to Flicker with a documented upload date of February 14, 2017. Richard Scott testified that he took the photo of the excavation on that date, but a County witness, Kell Rowen, testified that the upload date can be changed by the holder of the Flicker account. Ms. Rowen also made light of the fact that Richard Scott's 2017 pit photographs were not publicly accessible, but he had dozens of more private family photographs taken prior to 2014 that were publicly accessible. Mr. Scott provided a reasonable explanation for this – until 2014, using a different phone, he manually uploaded his photos to Flicker and those were made public. In 2014 he acquired a new phone and that phone automatically uploaded his photos, but made those photographs only privately accessible. Mr. Scott was unaware of the difference in accessibility. Although Mr. Scott could have changed the upload date of Ex. A-4 and Ex. A-5, there is no evidence that he did so. It is unfortunate that no party was able to present the metadata of those photographs to clarify the date they were taken.

In addition to the Flicker photographs, Jason Johnson testified that the excavator depicted in the photograph was not used in 2019. An examination of a YouTube video

Final Decision
PAGE 18

1   taken of the 2019 excavation work, Ex. 1-137, doesn't show the excavator depicted in

2   Ex. A-5. It's possible that the A-5 excavator was simply out of the camera view or not

3   used the day the video was taken, but Jason Johnson's testimony on this point does

4   corroborate Grump's position that mining was done on February 14, 2017.

5       It is not necessary to the resolution of this appeal whether any mining actually

6   occurred in February or March, 2017.  Consequently, since both sides have presented

7   compelling evidence on this issue, the issue is left as "somewhat questionable" whether

8   mining occurred in February and March, 2017.

9   15.   <u>April 22, 2017 Mining Likely Did Not Occur</u>.  The preponderance of evidence

10  establishes that mining activity likely did not occur on April 22, 2017 as alleged by

11  Grump witnesses.

12

13      Jason Johnson testified that he hauled 50-60 cubic yards out of the Grump pit on

14  April 22, 2017.  This work involved the only excavation work alleged by Grump after

15  April 3, 2017, except for the illegal activity that was stopped by the County on April 8,

16  2019. Jason Johnson testified that he had hauled 50-60 cubic yards from the Scott Pit to

17  a development project off Timberline, located 6 miles from the Scott Pit.  Jason Johnson

18  initially testified that he took the gravel from spoils that remained from mining allegedly

19  done in February 2017, and then subsequently modified his testimony that some material

20  had been taken from the bank.  On 7/23/20 surrebuttal, Russell Scott testified that on

21  April 22, 2017 Jason Johnson had "probably" done his excavation work in an area that

22  was started in February, 2017, specifically an area that was 2-3 feet deep, 80-100 feet

23  across and 50-60 feet wide extending from the ground to the left of the  stream stockpiles

24  depicted in Ex. I-45 to the bank behind the stockpiles.

25      The evidence establishing the absence of any activity in April is substantial, based

26  upon independent observations of no mining activity and highly dubious evidence

27  presented by Grump.  Overall, a major problem with the evidence presented by Grump

28  for all of its assertion in its 20-hour hearing was that none of the evidence was

29  independently verifiable.  Almost all of the documentation and testimony provided by

30

Final Decision
PAGE 19

Grump was made by family members associated with the Grump business or by lifetime family friends with decades of close working relationships (i.e. the Johnsons, see Finding No. 10).    Every single financial document and receipt presented by Grump was a document prepared by Grump, Peninsula Topsoil or Olympic Trucking that could have been easily manufactured for the appeal hearing.

Establishing that mining occurred in April 2017 at the Grump pit was critical in showing that the mining activity hadn't ceased in the two years prior to the illegal mining on April 8, 2019.  Doing work for a development project as alleged by Jason Johnson would have presented an ideal opportunity for Grump to present an invoice, check or bank records showing interaction with the third party that ordered the work for the development project.  Yet despite the significance of such documentation, the only document Grump provided was a 4/26/17 trucking slip prepared by Jason Johnson's company, Olympic Trucking, if not himself, that covered the transport of a loader from the Grump pit to the Peninsula Topsoil yard.  (Ex. A-6, Invoice #35277).

In addition to the absence of any documentation supporting claims of mining on April 22, 2017, it is also improbable that anyone doing the mining would have found it feasible.  Mr. Johnson noted that he acquired the 50-60 cubic yards for free from the Grump pit.  Mr. Johnson testified that acquiring the material elsewhere would have cost $0.50 to $1.00 per cubic yard.  Using the Grump pit as opposed to another pit thereby saved Mr. Johnson a maximum of $60.  For this $60 cost savings, Mr. Johnson used a hauling truck that according to him cost $2/minute to use.  As testified by Mr. Iddings on 7/23/20, the Grump Pit is six miles from the Timberline project, while the Huson gravel pit is adjacent to it and the Bear Creek gravel pit is located three miles from the project site.  According to Bruce Carter 7/23/20 testimony, Peninsula Topsoil has DNR permits for the Huson and Bear Creek pits.  Although Grump witnesses stated that the Huson pit is inactive, aerial photography, Ex. I-144, and observations presented by Ken Van Buskirk showed the pit as active.  Even if Huson could not be used for the Timberline project, it is uncontested that the Bear Creek pit was available for mining at half the

Final Decision
PAGE 20

distance to the development project than from the Grump pit. Jason Johnson testified that the 50-60 cubic yards he hauled took 5-10 truckloads. At $2/minute to operate a truck for an extra three to six miles per load due to using Grump instead of Huson or Bear Creek, it makes no financial sense to use the Grump pit.

The alleged April 22, 2017 mining also makes no sense from an operational standpoint. Earl Iddings, who owns a construction company with several pieces of mining equipment, testified that gravel would not be extracted from the pit in the manner testified by Jason Johnson. Jason Johnson testified that he "pulled" gravel from the face of the gravel pit bank behind some stream rock stockpiles. As testified by Mr. Iddings on 7/23/20, the embankment in question is near vertical with large trees and exposed roots overhanging the top. Mr. Iddings noted that any removal of gravel from that embankment face could result in the trees toppling onto the person engaged in the excavation and for that reason violates mining regulations. Mr. Iddings also testified on 7/23/20 that he had been in the pit in May and December of 2017 and again several times in 2018 after the alleged April 2017 mining and that he did not see that any excavation in the area alleged by Jason Johnson had occurred. He noted that he saw no removal of vegetation in his visits that would indicate any excavation in the pit area. He also noted that the vegetation along the banks as shown in photos I-45 and I-46 isn't consistent with the alleged clearing that would have been done for pulling. Finally, Mr. Iddings noted that the banks are still vertical in I-45 and 46, not knocked back as testified by Mr. Johnson.

Corroborating Mr. Idding's testimony is the testimony from Mr. Solene, Mr. Anspach and Mr. Byrne. Mr. Anspach was at the pit and took pictures on July 14, 2018. He stated the whole area was covered in vegetation. Mr. Byrne stated he has been on the property about once per year and was on the property in June of 2018. He stated he saw no sign of equipment use in the prior three years. He never witnessed any excavation in 2017 and saw just overgrown vegetation. Mr. Solene stated he'd been on the property in either March or April of 2017 and four times since. Under cross, Mr. Solene stated there was no equipment of any kind on the property during his visit in 2017. He noted in fact

Final Decision
PAGE 21

that if there'd been equipment on the site, it might have cleared up his confusion as to the purpose of the chip seal. The property was overgrown, showed no signs of excavation and looked the same from 2017 to 2018.

In addition to the operational and economic infeasibility of the project, there is also very high incentive to falsely stretch the February 2017 mining activity into April 2017. There is no correspondence in the green file prepared in 2017 or any time thereafter in the record that Grump had hired a lawyer to make its case for nonconforming use rights. As testified by Brad Carey, Russell Scott and Jack Johnson expressed the belief in their July 2018 with Mr. Carey that they were grandfathered in solely because of the Grump pit mining activity in the 1950s and 1960s. Mr. Scott and Mr. Johnson were not aware that those rights could be lost through two years of inactivity. The earliest Mr. Scott and Mr. Johnson would have been aware of this threat to their mining interest was the January 28, 2020 rescission interpretation, which identified the MCC provision that would terminate their rights after two years of cessation of use. At this point Mr. Scott and Mr. Johnson would have realized there was a two-year gap between their February 2017 mining and the mining they did on April 8, 2019. It would have been very tempting at that point to stretch the mining activity that occurred in February 2017 to include some additional mining on April 22, 2017. That small modification of facts could make the difference in their minds to whether or not Grump would lose its SM-6 mining rights. Of course, if no mining occurred in February 2017, that would mean that the Scotts and Johnsons engaged in wholesale manufacturing of evidence and that therefore their testimony would have very low credibility, including assertions of mining on April 22, 2017.

In addition to the high incentive to stretch the February mining into April 2017, there is the testimony by Mr. Glenn that the vegetation growth depicted in photographs of the pit is inconsistent with mining in February 2017, and by extension, additional mining in April 2017. There is also the testimony of Mr. Glenn of seeing no excavation of the site in 2017 and the testimony of neighbors that there was no activity at the site as

Final Decision
PAGE 22

1  outlined in Finding of Fact No. 14. Mr. Iddings stated he didn't see any material that was
2  disturbed on the native fill side in 2017 or 2018 when he was in that location.  He stated
3  he would have seen if any material had been extracted by either direct indication on the
4  pit face or from equipment tracks in the gravel.  There was no indication of that type of
5  disturbance.  Further, the banks are still vertical in Ex. I-45 and 46, not knocked back as
6  testified by Jason Johnson.  Overall, there is a substantial and overwhelming amount of
7  evidence that there was no excavation on April 22, 2017 and the Appellants offer no
8  evidence in response except the testimony of two witnesses with an ownership or close
9  business relationship with Grump and a single trucking slip dated April 26, 2017 that
10  reveals very little of what was done on April 22, 2017.  Given all these circumstances,
11  any reasonably minded person would have to conclude that the preponderance of
12  evidence establishes that no mining activity occurred on April 22, 2017.
13
14  16.    <u>No Test Pits Dug in April or May 2017</u>.  The preponderance of evidence
15  establishes that test pits were likely not dug in April or May 2017 as alleged by Grump
16  witnesses. The evidence is fairly compelling that the test pit area was overgrown with
17  vegetation and that such vegetation would have been cleared to afford access to the
18  backhoe used by Mr. Johnson to dig the test pit.  Yet Mr. Glenn found the area overgrown
19  with vegetation both before and after the alleged digging of the test pits.  Further, as
20  testified by Mr. Iddings, who owns a construction business with mining equipment, test
21  pits aren't dug in the middle of logging roads for several practical reasons.  Finally, Jason
22  Johnson's testimony regarding any work in April 2017 lacks credibility given that his
23  testimony regarding pit excavation was soundly refuted by substantial evidence as
24  outlined in Finding No. 15.
25      Jason Johnson testified in late April or May 2017 he dug test pits in the middle of
26  the upper access road above the pit and one farther up the hill.  Mr. Johnson stated the
27  test pits were dug 10-15 feet deep, which is the extent to which the machine can dig. The
28  holes were 2-3 feet wide, corresponding with the width of the backhoe's bucket. He
29  further stated these pits were then filled in for safety. He speculated a layperson would
30

Final Decision
PAGE 23

1  not be able to distinguish the test pit because they were returned to their prior topography.
2  Mr. Johnson stated they were digging the test pits to see if the gravel was at least 10 feet
3  deep in the upper area.

4      Mr. Johnson stated the material from the test pits was not sent out to a geologist
5  as he's been in the business for 20 years and can't remember ever sending out a sample
6  from test pits.

7      Mr. Earl Iddings testified that doing test pits in the road makes no sense. It's not
8  industry standard to dig a test pit hole in a road when you have plenty of acreage around
9  your road. A test pit dug in the roadway jeopardizes the roadway's integrity by creating
10 a soft spot, unless a compactor is used to restore the road surface. There is no evidence in
11 the record of a compactor being brought to the Grump pit. Additionally, a test pit dug in
12 the roadway could hit a water table and wash the road away. At the Grump pit the area
13 surrounding the logging roads is soft vegetation such as scotch broom. It would make
14 more sense to dig there than in the compacted roadway surface. Mr. Iddings testified he
15 was at the road in May 2017 chasing after his dog and saw no signs of test pitting. The
16 road above his property is impassable and they would have had to bulldoze their way to
17 the alleged test pit area, pushing away the alders and scotch broom along the sides of the
18 road.
19

20     Mr. Glenn had looked at the alleged test pit area closely during the appeal hearing
21 and found that brush had steadily grown in this logging area and made it impassable by
22 April/May of 2017. His observations were confirmed by the testimony of Iddings who
23 noted that from his site visits starting in 2005-6 and then twice or three times per year
24 from 2015 forward, he found the area increasingly overgrown and eventually impassable
25 to even pedestrians. As testified by Mr. Glenn, if mining equipment had been brought up
26 to that area in late April or early May 2017, the road vegetation would have shown up as
27 cleared in the 2018 photographs he looked at. He testified that instead he viewed
28 increasingly overgrown vegetation in this area.
29
30

Final Decision
PAGE 24

17.     No Mining Activity Between April 3, 2017 and April 3, 2019.   There was no mining at the Grump site between April 3, 2017 and April 3, 2019.  The testimony of Rick Glenn and neighboring property owners made it more likely than not that over this two-year period no mining activity had occurred for the reasons identified in Finding of Fact No. 13.   Although it's unclear whether Mr. Glenn's observations stretched all the way into April, 2019, the historical infrequency of mining identified in Finding of Fact No. 12 coupled with the testimony of no activity by the neighbors establishes that more likely than not no mining occurred until April 8, 2019.   Grump did not overcome this evidence by assertions that mining occurred on April 22, 2017 or that test pits were dug in April or May 2017 as well for the reasons identified in Findings No. 15 and 16.   For these reasons it is determined that the preponderance of evidence establishes that there was no mining activity between April 3, 2017 and April 3, 2019.

## Conclusions of Law

**Procedural:**

1.  Authority of Hearing Examiner. MCC 15.03.050(G) provides the Examiner with the authority to review and issue a final decision upon all appeals of administrative decisions, including appeals of administrative determinations.

2.  Nonconforming Use Rights Set by SM-6 Certification Terminated by Two Year Rule. For the reasons identified in the Examiner's first and second summary judgment motions of this appeal, in order to terminate the nonconforming use rights of Grump and thereby have its January 28, 2020 administrative determination sustained, Mason County has the burden of establishing by a preponderance of evidence that Grump ceased mining activity for any two year period between July 1, 2015 and April 3, 2019.  The legal analysis of the first and second summary judgment motions of this appeal is adopted by reference for this Final Decision.  Mason County has met its burden of proof for the reasons identified in Finding of Fact No. 17.  For this reason, Grump has lost the nonconforming use rights set by the SM-6 certification and the County's SM-6 Rescission is sustained.

Final Decision
PAGE 25

3.   <u>Nonconforming Use Rights for Hobby Mine Use Not Affected by this Decision</u>.  As noted in the overview of this Decision, it is important to note that the nonconforming use rights assessed by this Decision are for the mining proposed in Grump's reclamation permit.  They are not for the continuation of Grumps historical sporadic and infrequent use.  This distinction is an important basis of this Decision, because there is a line of cases that holds that infrequent activity that exceeds the time limits of nonconforming use termination clauses can still qualify as nonconforming uses if that type of activity is a long standing practice of the use.

An excellent and current case that surveys the court opinions on nonconforming use rights of infrequently used quarries is *Vickers v. Franklin Cnty. Bd. of Commissioners*, 444 P.3d 380 (Kan. Ct. App. 2019).  *Vickers* involved the nonconforming use rights of a quarry subject to a nonconforming use termination clause that nonconforming use rights "voluntarily discontinued" for a period of six consecutive calendar months shall not thereafter be resumed.  The regulations specifically eliminated a requirement to establish intent to abandon.  The rock quarry at issue was not involved in any excavation, but rather sold a modest amount of rock it had excavated in years past in the following amounts:  3,283 tons in 1996, 66.52 tons in 1997, 112 tons in 1998, 2,246 tons in 1999, and 1912 tons in 2000. No other use—other than operating and maintaining the Quarry—occurred on the land from the date the Quarry was established.  Significantly, the court ruled that even though there were periods exceeding six months between rock sales, the Court did not find the quarry's nonconforming use rights to be terminated because of these sales intervals:

> *We decline to adopt Plaintiffs' suggestion that a nonconforming quarry use is invariably abandoned between rock sales. A quarry is a unique business. Although intent to abandon is not relevant to the 1998 Zoning Regulations, courts widely recognize that quarry operations are inherently sporadic and abandonment may not be inferred from the mere fact that blasting or crushing stopped or rock sales fluctuated. As the court in Tigard Sand observed: "[Q]uarry uses are generally more likely than some other types of uses to be characterized by variations in activity levels and, when that is so, that their 'continuity' should be gauged accordingly." 149 Or. App. at 423-24.*

Final Decision
PAGE 26

In reaching this conclusion, the *Vickers* court surveyed court opinions from several jurisdictions on what level of activity is necessary to maintain nonconforming use status for mining operations.  One pertinent case it came across was *Polk County. v. Martin*, 292 Or. 69, 636 P.2d 952 (1981), which recognized that although the sporadic and intermittent use of the mine under its review was relevant to the scope of the permitted nonconforming use, it did not negate the existence of the on-going quarry business.

At issue in the *Polk County* case was application of a nonconforming use provision to a mine of limited historical activity.  The provision in question, ORS 215.130 (5), simply provided that a lawfully created use of land may continue despite changes in zoning laws.  In construing ORS 215.130 (5), the *Polk* court found as follows:

> *A sporadic and intermittent use is sporadic and intermittent, but it may nonetheless be a "lawful use" under ORS 215.130 (5). The nature and extent of the prior lawful use determines the boundaries of permissible continued use after the passage of the zoning ordinance. The significant thing is that a sporadic and intermittent use may give rise to a permitted nonconforming use, with the extent of the permitted nonconforming use limited to the sporadic and intermittent use that existed prior to the enactment of the zoning ordinance.*

292 Or. at 76.

Under the line of cases surveyed in the *Vickers* opinion, Grump might be able to successfully argue that its sporadic and intermittent use, as outlined in Finding of Fact No. 12, entitles it to nonconforming use rights.  Under that same line of cases, it might even be able to successfully assert that its storage and occasional use of rock stockpiles qualifies as continuous mining use. However, under the *Polk* holding that would only entitle it to the nonconforming use rights of a sporadic and intermittent mining operation that stores and occasionally uses stockpiles.  As outlined in the Findings of Fact, the Grump operation has been limited to 1.18 acres for more than 60 years.  In terms of mining area, Grump only needs to get a reclamation permit if it seeks to mine more than three acres. *See* RCW 78.44.031(17)(a).

Final Decision
PAGE 27

In short, the SM-6 certification issued by the County found nonconforming use rights across the entirety of a 66.5 acre site for a minimum three acre mining operation, for a site that has been used only a handful of times over the last twenty-five years for a pit less than 1.18 acres in size. The type of mining that Grump had in mind with its reclamation permit had little relation to the mining it has been doing for decades. Mason County correctly rescinded its SM-6 certification when it discovered that Grump was not engaged in any mining that was similar to what it had proposed.

The County's two-year termination deadline set by MCC 17.05.016A was wholly appropriate for the type of mining that Grump was seeking in its reclamation permit. The two-year deadline not only serves as a proportionate response to the type of investment one would expect for a mining activity of the scale necessary for a reclamation permit, it also provides some fair notice to a surrounding community. As testified by Mr. Iddings, he would not have purchased his home if he thought he knew he was going to be living next to a gravel pit. No doubt that would be the sentiment of most people in the surrounding Belfair community. Given the lack of activity of the Grump pit for decades and the zoning of that property as RR-5 for decades, surrounding residents cannot be reasonably expected to have foreseen that the Grump property could explode into a massive 66.5-acre mining operation at any time. As outlined in the summary judgment rulings of this case, nonconforming use rights are protected property rights. However, as a right protected by constitutional due process and takings clauses, the public interest is a pertinent factor in balancing the extent of that right. That public interest would be seriously compromised if Grump were allowed to sit on its rights for decades and then destroy the character of its surrounding community when it finally decided it was in its economic interest to do so.

A final point on the extent of Grumps protected nonconforming use rights is recognition that a seminal Washington nonconforming use case strongly supports the concept that nonconforming use rights can be intensified. See *Keller v. Bellingham*, 92 Wn. 2d 726 (Wash. 1979). However, *Keller* did recognize that at some point a change in

Final Decision
PAGE 28

intensity results in a change of use that is no longer protected as a nonconforming use right:

> When an increase in volume or intensity of use is of such magnitude as to effect a fundamental change in a nonconforming use, courts may find the change to be proscribed by the ordinance. 1 R. Anderson, supra at § 6.47; 8 A. McQuillin, Municipal Corporations § 25.207 (3d ed. 1976). Intensification is permissible, however, where the nature and character of the use is unchanged and substantially the same facilities are used. Jahnigen v. Staley, 245 Md. 130, 137, 225 A.2d 277 (1967). The test is whether the intensified use is "different in kind" from the nonconforming use in existence when the zoning ordinance was adopted. 3 A. Rathkopf, The Law of Zoning and Planning, ch. 60-1, § 1 (4th ed. Cum. Supp. 1979).

For reasons previously discussed, the type of increase in mining contemplated by Grump in its DNR application effected a fundamental change in use, from a hobby mine used every few years to a mining operation over a 66.5-acre area that necessitates a reclamation period. The proposed mining is more than just a change in intensity. Therefore, the *Vickers* line of cases do not justify converting the nominal historical mining activity of the Grump mine into protected nonconforming use rights significant enough to necessitate a reclamation permit.

Final Decision
PAGE 29

1

**Decision**

2     Grump's appeal is denied.  Mason County's rescission of its SM-6 Certification

3  on January 28, 2020 is sustained on the grounds that Grump lost its nonconforming use

4  mining rights through cessation of use from April 3, 2017 through April 3, 2019.

5

6     ORDERED this 11th day of August 2020[4].

7

8

9  Phil A.Olbrects
    Mason County  Hearing Examiner

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28  [4] A series of minor non-substantive corrections were made to this Decision on August 27, 2020 in response
29  to Intervenor's Errata Request dated August 21, 2020.  The parties were advised that the requested
    corrections would be made without a change in the issuance date for purposes of LUPA appeal if there
30  were no objections from the parties.  No parties made any objection to the requested corrections.

Final Decision
PAGE 30

**CERTIFICATE OF SERVICE**

1

2          I, certify that on February 24, 2021, I electronically filed the foregoing, Grump

3    Ventures LLC's Land Use Petition Pursuant to RCW 36.70C; First Amended Complaint

4    for Damages, with the Clerk of the Court using the CM/ECF System, which will send

5    notification of said filing to the attorneys of record that have, as required, registered with

6    the Court's system.

7          I certify under penalty of perjury under the laws of the State of Washington that

8    the foregoing is true and correct.

9          EXECUTED at Seattle, Washington on this 24th day of February, 2021.

10

11                                        *s/ I'sha M. Willis*
                                         I'sha M. Willis, Declarant
12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF SERVICE - 1



1191 Second Avenue Suite 1800
Seattle, WA  98101-2996
(206) 623-9372