1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

DALE BROWN, et al.,

        Plaintiffs,

    v.

MASON COUNTY, et al.,

        Defendants.

GRUMP VENTURES, LLC,

        Petitioner,

HOOD CANAL GRAVEL MINE
OPPOSITION ASSOCIATION,

        Intervenor,

    v.

MASON COUNTY, et al.,

        Respondents.

C20-5628 TSZ

ORDER

THIS MATTER comes before the Court on the Petition, docket no. 25, and the administrative appeal pursuant to the Land Use Petition Act ("LUPA"), RCW Ch. 36.70C, brought by Grump Ventures, LLC ("Grump"). The Court held oral

ORDER - 1

argument on May 10, 2021. See Minutes (docket no. 33). At oral argument, Dale Johnson represented Grump, Kenneth Harper represented Mason County ("the County"), and David Bricklin represented the Hood Canal Gravel Mine Opposition Association ("HCGMOA"). Id. Having considered the oral arguments of counsel and having reviewed all papers filed in support of, and in opposition to, the Petition, the Court enters the following Order.

**Background**

Grump, owned by Russell Scott, owns six-contiguous parcels in Belfair, Washington totaling 66.5 acres (the "Property"). Administrative Record Part 1 ("AR1") (docket no. 19-1 at 96 (Scott Decl. (April 2020)) & 104 (Form SM-6)). Beginning around 1950, a portion of the Property was used to operate a gravel surface mine. AR1 at 96 (Scott Decl. (April 2020)). In 1996, the Property was zoned as Rural Residential 5 ("RR5"). AR1 at 271 (Rowen Decl.). A surface mine is not permitted on RR5 zoned property absent a legal nonconforming use. AR1 at 271 (Rowen Decl.); Mason County Code ("MCC") 17.04.222. Currently, a gravel pit extends over 1.18 acres of Grump's property. Administrative Record Part 8 ("AR8") (docket no. 19-8 at 123) (Revised Findings of Fact, Conclusions of Law and Final Decision ("Final Decision")). The remaining portion of the land is undeveloped with some logging roads. AR8 at 123 (Final Decision).

In 2017, Grump wanted to expand its mining operations within the boundaries of the Property and sought a Reclamation Permit from the Washington State Department of Natural Resources. AR1 at 97 (Scott Decl. (April 2020)). As part of the application,

Grump needed to submit a Form SM-6 ("SM-6"). WAC 332-18-01002. The SM-6

requires local zoning officials to answer "yes" or "no" to the following two questions:

> 1.      Has the proposed surface mine been approved under local zoning and
> land-use regulations?
>
> 2.      Is the proposed subsequent use of the land after reclamation consistent
> with the local land-use plan/designation?

AR1 at 104 (SM-6).

A Mason County official filled out the SM-6 for Grump's Reclamation Permit

application on June 30, 2017. AR1 at 104 (SM-6). The official checked "yes" to both

questions. AR1 at 104 (SM-6). On the bottom of the SM-6, the official wrote, "*Found

to be consistent with the diminishing assets doctrine." AR1 at 104 (SM-6).

After receiving the SM-6, Grump took further steps to complete its Reclamation

Permit application, including preparing a State Environmental Policy Act ("SEPA")

checklist and applying to the County for a Class IV General Forest Practice

Application/Notification ("FPA") to allow timber removal at the Property. AR1 at 98

(Scott Decl. (April 2020)). On June 22, 2018, the County issued a Mitigated

Determination of Nonsignificance ("MDNS") for the proposal, meaning that it had

determined the proposal "d[id] not have a probable significant adverse impact on the

environment." AR1 at 106 (MDNS); WAC 197-11-350.

In July 2018, members of the Belfair community who opposed the proposed mine

expansion formed the HCGMOA. AR1 at 22 (Abel Decl.). That same month, Grump

withdrew its SEPA and FPA applications. Administrative Record Part 2 ("AR2") (docket

no. 19-2 at 26 (Scott Decl. (May 2020)). According to Scott, Grump withdrew the

applications due to "certain highly negative responses and threats" that his family and he received during the SEPA comment period. AR2 at 26 (Scott Decl. (May 2020)).

Grump engaged in ground extraction of gravel with heavy equipment on April 7 and 8, 2019. AR2 at 187 (Order on Motions for Second Summary Judgment ("Order 2")); Grump Petition (docket no. 25 at 11). The County believed that, because it had not issued Grump any permits, the removal of gravel from the site was illegal and served a "Stop Work Order" on April 8, 2019. AR1 at 272 (Rowen Decl.).

On January 28, 2020, the County issued an "Administrative Determination" rescinding the SM-6 ("SM-6 Rescission"). AR1 at 7–8 (SM-6 Rescission). The County stated that since signing the SM-6, it had "received additional information" and it "no longer maintains that current use of the property is legal nonconforming surface mining and acknowledges that the Diminishing Assets Doctrine does not apply to the subject properties." AR1 at 7 (SM-6 Rescission). The County further cited MCC 17.05.016(a)[1] and stated that "[c]urrent zoning does not support surface mining and any past surface mining has been abandoned for a period of more than two years." AR1 at 7 (SM-6 Rescission).

_____

[1] MCC 17.05.016(a) states as follows:

**17.05.016 – Abandonment; reconstruction.**

(a)    If any nonconforming use of land and/or building is abandoned, or ceases for any reason whatsoever (including destruction of the building) for a period of two years or more, then any future use of such land and/or building shall conform to the provisions of this chapter. Upon written request of the property owner, the administrator shall grant one, one-year extension to the aforementioned two-year period.

Grump appealed the County's SM-6 Rescission to the Hearing Examiner of Mason County ("Examiner") on February 10, 2020. AR1 at 1–2 (Notice of Appeal). HCGMOA intervened in the proceedings. AR1 at 72–78 (Order Granting Motion to Intervene). During the prehearing process, the Examiner issued two summary judgment orders. See AR1 at 377–410 (Order on Motions for Summary Judgment (Order 1)); AR2 at 231–77 (Order 2). In the first order, the Examiner concluded that the SM-6 constituted a final land use decision and MCC 15.11.020A's 14-day appeal deadline prohibited the County "from revisiting the determination in its SM-6 Interpretation that Grump's mining operation was a valid nonconforming use at the time the SM-6 Interpretation was issued on June 30, 2017."[2] AR1 at 390 (Order 1). The first order further concluded that, given the judicial policy favoring eliminating nonconforming uses, Grump's nonconforming use could still be terminated and "any period of inactivity subsequent to the issuance of the June 30, 2017, SM-6 Interpretation can be considered in the application of MCC 17.05.016 and be tacked on to any contiguous period of inactivity that occurred prior to issuance of the interpretation." AR1 at 406 (Order 1).

In the second summary judgment order, the Examiner determined that a material issue of fact existed regarding whether Grump failed to engage in mining or gravel extraction for any continuous two-year period between July 1, 2015 (two years before the day after the SM-6), and April 7, 2019 (the undisputed date that Grump engaged in mining). AR2 at 277 (Order 2). The Examiner additionally addressed several legal

_____

[2] Neither party challenges this conclusion in connection with the pending LUPA Petition.

issues and concluded that: (1) MCC 17.05.016 does not require a showing of intent for a nonconforming use to terminate based on cessation, (2) the County and HCGMOA had the burden to establish that Grump lost its nonconforming use, and (3) mining and gravel use involves extracting minerals from the ground, as opposed to stockpiling gravel or hauling gravel from stockpiles. AR2 at 245–60, 274–77 (Order 2).

The Examiner held a virtual hearing in July 2020. AR8 at 123 (Final Decision). At the hearing, the County argued that that Grump had not engaged in any mining activity between April 3, 2017, and April 3, 2019. To demonstrate that Grump had not mined in the relevant two-year period, the County presented testimony from Rick Glenn, an expert in using aerial and terrestrial photographs to assess mining and forestry activity. AR8 at 117, 127–30 (Final Decision). In Glenn's expert opinion, the photographs demonstrated that no appreciable amount of mining had occurred on the Property since 2012. AR8 at 127 (Final Decision). The testimony of neighbors corroborated Glenn's observations, as several neighbors who live adjacent to or nearby the Property testified that they did not see or hear any mining activity between April 3, 2017, and April 3, 2019. AR8 at 129–30 (Final Decision).

In response, Grump presented evidence relating to two instances of alleged mining activity during the relevant time period. Specifically, Grump presented evidence that 50–60 cubic yards of gravel had been extracted on April 22, 2017, and that two test pits were dug in April or early May 2017. AR8 at 118, 134, 138 (Final Decision). The Examiner, however, found, on a more likely than not basis, that these activities did not occur. AR8 at 134–39 (Final Decision). Regarding the gravel extraction in April 2017, the Examiner

determined that Grump's witnesses were not credible and found that the extraction more likely took place in February 2017. AR8 at 134–38 (Final Decision). The Examiner also noted that Grump did not present any invoice or bank statements to corroborate the work and that none of Grump's evidence was independently verifiable. AR8 at 119, 134 (Final Decision). With respect to the test pits, the County's expert witness opined that the work did not occur because brush overgrowth made the site of the test pits impassable. AR8 at 139. The Examiner also heard testimony that test pits would not be dug in the middle of a road, like Grump claimed, because it would have a high potential of undermining the road's utility. AR8 at 139 (Final Decision).

On August 11, 2020, the Examiner issued his Final Decision denying Grump's appeal and sustaining the SM-6 Rescission "on the grounds that Grump lost its nonconforming use mining rights through cessation of use from April 3, 2017, through April 3, 2019." AR8 at 145 (Final Decision). Grump appealed to Thurston County Superior Court pursuant to LUPA, RCW Ch. 36.70C. Complaint (docket no. 1-1 at 2–16), Grump Ventures LLC v. Mason County, No. 20-5906-TSZ (W.D. Wash.). The County then removed the case to this Court. Notice of Removal (docket no. 1), Grump Ventures LLC v. Mason County, No. 20-5906-TSZ (W.D. Wash.). HCGMOA was granted leave to intervene in the proceedings. Order (docket no. 5), Grump Ventures LLC v. Mason County, No. 20-5906-TSZ (W.D. Wash.). Finally, the Court consolidated the case with Brown et al. v. Mason County et al., No. 20-5928-TSZ (W.D. Wash). Consolidation Order (docket no. 17).

## Discussion

### A. Standard of Review

Under LUPA, a court may grant relief only if the appealing party has carried its

burden of establishing one of the following standards:

> (a)  The body or officer that made the land use decision engaged in unlawful procedure or failed to follow a prescribed process, unless the error was harmless;
>
> (b)  The land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise;
>
> (c)  The land use decision is not supported by evidence that is substantial when viewed in light of the whole record before the court;
>
> (d)  The land use decision is a clearly erroneous application of the law to the facts;
>
> (e)  The land use decision is outside the authority or jurisdiction of the body or officer making the decision; or
>
> (f)  The land use decision violates the constitutional rights of the party seeking relief.

RCW 36.70C.130.  Standards (a), (b), (c), (d), and (f) are at issue here.  Subsections (a),

(b), and (f) present questions of law that the Court reviews de novo.  Phoenix Dev., Inc.

v. City of Woodinville, 256 P.3d 1150, 1154 (Wash. 2011).  When reviewing a challenge

under subsection (c), the Court views the facts and inferences in the light most favorable

to the party that prevailed in the highest forum exercising fact-finding evidence.  See id.

"Under the substantial evidence standard, there must be a sufficient quantum of evidence

in the record to persuade a reasonable person that the declared premise is true."  Id.

Regarding subsection (d), a finding is clearly erroneous "when, although there is

ORDER - 8

evidence to support it, the reviewing court on the record is left with the definite and firm conviction that a mistake has been committed." Id.

The party asserting a nonconforming use has the initial burden of proving that the nonconforming use exists. City of University Place v. McGuire, 30 P.3d 453, 457 (Wash. 2001). If the party meets this initial burden, the burden then shifts to the opposing party to prove abandonment or cessation of the nonconforming use. See id. The burden of proving abandonment or cessation is "not an easy one." See id.

### B. MCC 17.05.016(a)

Grump contends that the Examiner erred by: (1) interpreting MCC 17.05.016(a) to require that Grump had to show physical extraction from the ground to maintain its nonconforming use, (2) determining that Grump's nonconforming use right could be extinguished based upon inactivity **prior** to the County issuing the SM-6, and (3) concluding that the MCC does not require intent for cessation of a nonconforming use.[3] The Court addresses each point in turn.

---

[3] Grump also asserts that the Examiner's "'hobby mine' finding" misapplied the law and constituted engaging in unlawful procedure. Grump Petition (docket no. 25 at 22–23). But, as opposed to making a finding regarding a hobby mine, the Examiner merely acknowledged that Grump had sporadically and infrequently used 1.18 acres of its Property for minor incidents of excavation and mining related activities, and recognized that a vein of cases held that such infrequent use could preserve a nonconforming use right to a hobby mine. AR8 at 116–17 (Final Decision). Ultimately the Examiner stated that his Final Decision did not affect any potential nonconforming use rights for a hobby mine. AR8 at 116–17 (Final Decision). Contrary to Grump's contention, the Examiner's discussion of a hobby mine does not demonstrate a misunderstanding of the diminishing assets doctrine. In that portion of the Final Decision, the Examiner was not stating that a nonconforming use would not apply to the entire Property, but rather that the nonconforming use that Grump sought in its Reclamation Permit, i.e. a commercial mine, would be a significant enough intensification of the nonconforming use Grump had been engaging in since at least 1995 as to constitute a fundamental change from its

The principles of statutory construction apply to the interpretation of a county ordinance. Ellensburg Cement Prod., Inc. v. Kittitas County, 317 P.3d 1037, 1041 (Wash. 2014). A court's fundamental objective when interpreting a statute is to ascertain and carry out the Legislature's intent. Tateuchi v. City of Bellevue, 478 P.3d 142, 149 (Wash. Ct. App. 2020). When a statute's meaning is plain on its face, the Court must give effect to that plain meaning. Id. Courts "determine the plain meaning of a statute by looking to the ordinary meaning of words, the basic rules of grammar, and the statutory context to conclude what the legislature has provided for in the statute and related statutes." Id. (citation omitted). Further, courts give considerable deference to the construction of a challenged ordinance by the officials charged with its enforcement. Id.

### 1. Physical Extraction

Grump argues that it did not need to engage in physical extraction of mineral resources to maintain its nonconforming mining use right. The Court determines the Examiner correctly determined that physical extraction was required.

Prior to the Examiner's ruling on the second motion for summary judgment, Grump submitted various evidence to prove that it had not ceased its use of the surface mine. For example, Scott stated in a declaration that Mason County had used the gravel pit to stockpile 2,000 tons of chip seal aggregate from 2014–15. AR2 at 235 (Order 2). Additionally, Scott declared that a company, Peninsula Topsoil, purchased and sold

---

historical use. The Examiner reserving the issue of whether Grump's sporadic use of the mine might have preserved a nonconforming use right to a hobby mine did not demonstrate a misapplication of the law.

gravel from the pit and dug test holes to examine the quality of the gravel between February and April of 2017.[4]  AR2 at 235 (Order 2).  Scott further stated that once a year someone would shovel gravel from the pit to repair his mother's driveway.  AR2 at 236 (Order 2).  A licensed general contractor, Richard Moore, also provided a declaration that he had obtained gravel from the pit "over the years."  AR2 at 237 (Final Decision).

The Examiner then issued his Order on Motions for Second Summary Judgment, in which he interpreted the MCC as requiring evidence of the extraction of minerals from the ground to demonstrate a nonconforming use of gravel mining.  AR2 at 275–77 (Order 2).  Under this interpretation, "[t]he stockpiling of gravel and removal and hauling of gravel from such stockpiles without any ground extraction does not qualify as mining and/or gravel extraction."  AR2 at 275 (Order 2).  Accordingly, the Examiner ruled that to terminate Grump's nonconforming use to surface mining, the County had to demonstrate that Grump failed to physically extract minerals from the ground for a two-year period between July 1, 2015, and April 7, 2019.

The Court must first determine what activities constitute a "nonconforming use" for surface gravel mines.  Under MCC 17.05.016(a), a right to a nonconforming use is terminated if the use is abandoned or ceased for any reason whatsoever for two years or more.  Additionally, regarding nonconforming use rights to mine, Washington has adopted the diminishing assets doctrine.  McGuire, 30 P.3d at 459.  Under this doctrine,

---

[4] In the Final Decision, the Examiner found, on a more likely than not basis, that the asserted digging of the test pits in April 2017 did not occur.  AR8 at 134–38 (Final Decision).

"[t]he proper scope of a lawful nonconforming use in an exhaustible resource is the *whole* parcel of land owned and intended to be used by the owner at the time the zoning ordinance was promulgated."  Id.

MCC 17.06.010 defines "nonconforming land use" as "a use or activity that was lawful prior to the adoption, revision or amendment of the ordinance codified in this chapter but fails by reason of such adoption, revision or amendment to conform to the present performance standards of the Mason County development regulations."  The MCC does not define "mining."  For terms not defined in the MCC, MCC 17.06.010 provides that the Moskowitz Dictionary[5] controls.  The Moskowitz Dictionary defines "mining" as "[t]he extraction of minerals, including solids, such as coal and ores; liquids, such as crude petroleum; and gases, such as natural gases."  Based on these definitions, a "nonconforming use" for surface mining is the extraction of minerals on land that was lawful prior to the adoption of the MCC but no longer conforms to the present regulations.[6]  Accordingly, to preserve its nonconforming use, Grump must demonstrate not that it merely intended to mine or that it maintained the Property for mining, but that it actually extracted minerals from the Property.  See King Cnty. Dep't of Dev. & Env't Serv. v. King County, 305 P.3d 240, 245 (Wash. 2013) (holding that a property owner did not establish a nonconforming use of a materials processing facility where, although

---

[5] Moskowitz, Harvey S. and Lindbloom, Carl G.; The New Illustrated Book of Development Definitions.  New Brunswick, NJ, Center for Urban Policy Research, 1993.

[6] Grump argues that the Examiner erred by not considering the Moskowitz Dictionary's definition for "use."  The MCC, however, defines "nonconforming land use," so there was no need for the Examiner to separately refer to the Moskowitz dictionary's definition of "use."

1  the owner had obtained rights to the land, stored materials on the property, and expressed

2  intent to commence recycling, he had not yet commenced actual recycling on the

3  property).

4       Grump argues that the Examiner's definition was inconsistent with case law. Each

5  of the Washington cases Grump cites, however, is distinguishable in that they involved

6  abandonment ordinances, and thus required intent for a nonconforming use to terminate.

7  For instance, in McGuire, the Washington Supreme Court stated that, to show

8  abandonment, a party must establish both an intention to abandon and "an overt act, or

9  failure to act, which carries the implication that the owner does not claim or retain any

10  interest in the right to the nonconforming use." 30 P.3d at 459. In applying this standard,

11  the McGuire Court concluded that substantial evidence supported the hearing examiner's

12  determination that there was no act or omission that was proof of intent to abandon. Id.

13  Similarly, in both decisions of the Washington State Court of Appeals on which Grump

14  relies, the nonconforming uses were deemed not terminated based on lack of evidence of

15  intent to abandon. Rosema v. City of Seattle, 269 P.3d 393, 396 (Wash. Ct. App. 2012);

16  see Tateuchi, 478 P.3d at 151. In those cases, although the owners had not used the

17  properties for their nonconforming uses, evidence of maintaining the structural capacity

18  of the properties for the respective nonconforming uses precluded a finding that any of

19  the owners had an intent to abandon. 269 P.3d at 396; see 478 P.3d at 151. Because, as

20  explained below, MCC 17.05.016 does not require intent for a nonconforming use to

21  terminate under its cessation prong, the analyses in McGuire, Rosema, and Tateuchi are

22  irrelevant to the Court's inquiry in this case.

23

1    Grump also cites a California Supreme Court case that is not binding here.

2    Hansen Bros. Enters. v. Bd. of Supervisors, 907 P.2d 1324 (Cal. 1996). Even so, Hansen

3    Bros. is distinguishable in that it considered the nonconforming use of an aggregate

4    production and sale business. Id. at 1348. In that case, the California Supreme Court

5    acknowledged that an aggregate production and sale business had several integral parts,

6    and the fact that the owner had not been engaging in one of the integral parts, namely

7    rock quarrying, did not justify terminating the entire nonconforming use. Id. at 1347–48.

8    Here, Grump asserts only a "nonconforming use right to surface mining" as oppose to a

9    right to operate a larger business of which surface mining is only an integral part. See

10   Grump Petition (docket no. 25 at 10) ("The County Commissioners assured the Scotts

11   that they would maintain a nonconforming use right to surface mining on the rezoned

12   parcels."). Moreover, like the cases from the Washington courts, Hansen Bros. is

13   distinguishable on the basis that it concerned an abandonment ordinance and accordingly

14   required proof of intent. 907 P.2d at 1347.[7] For these reasons, Grump's challenge to the

15   Examiner's interpretation, namely that physical mining is required to maintain a

16   nonconforming use, lacks merit.

---

[7] HCGMOA argues that Grump waived any argument as to whether permitting activity could constitute "mining related" activity because Grump did not submit any evidence at the evidentiary hearing related to permitting or investigatory studies. HCGMOA Response (docket no. 29 at 3–5). Because the Court affirms the Examiner's ruling that physical extraction is required to preserve the nonconforming use of surface mining, the Court need not address this issue.

1      **2. Inactivity Prior to SM-6**

2      Grump argues that the Examiner erred in two ways:  (i) by determining that

3 Grump's nonconforming use rights could be terminated after issuance of the SM-6. and

4 (ii) by concluding that termination could be based upon inactivity prior to the County

5 issuing the SM-6.  The Court rejects both contentions.

6      Regarding termination after the County issued the SM-6, the Examiner concluded

7 that the SM-6 determined only that Grump's mining operation was a valid

8 nonconforming use as of June 30, 2017, and did not address any future use rights.  AR1

9 at 390, 406 (Order 1).  Indeed, the two questions on an SM-6 do not inquire into the

10 future use rights of a proposal.  See AR1 at 104 (SM-6).  Because the SM-6 does not

11 make any assurances about the validity of Grump's nonconforming use rights with

12 respect to any future date, permitting the County to argue that Grump's nonconforming

13 use rights terminated after issuance of the SM-6 does not constitute a collateral attack.

14      Likewise, the Examiner's consideration of inactivity prior to the issuance of the

15 SM-6 does not constitute a collateral attack on the SM-6.  Looking again to the SM-6 to

16 resolve this issue, it does not make any statements regarding the application of MCC

17 17.05.016 to Grump's proposal or to any past activity or inactivity of the nonconforming

18 use.  See AR1 at 104 (SM-6).  Nothing in the SM-6 suggests that inactivity for a

19 nonconforming use would stop accruing merely because an SM-6 had been issued.  See

20 AR1 at 104 (SM-6).  Although permitting a county to determine that a party has lost its

21 nonconforming use rights after it issued a SM-6 reduces predictability in the permitting

22 process, this consideration is balanced against the policy that nonconforming uses are

23

1    disfavored.  See Tateuchi, 478 P.3d at 150 (noting that nonconforming uses are

2    disfavored).

3          **3.  Intent under MCC 17.05.016**

4          Grump asserts the Examiner misinterpreted MCC 17.05.016 by determining that it

5    does not require a showing of intent if the nonconforming use "ceases for any reason

6    whatsoever."  The Court concludes the Examiner correctly interpreted the ordinance.

7          To refresh, MCC 17.05.016(a) provides:

8          **17.05.016 – Abandonment; reconstruction.**

9          (a)    If any nonconforming use of land and/or building is abandoned, or
                  ceases for any reason whatsoever (including destruction of the
10                 building) for a period of two years or more, then any future use of
                  such land and/or building shall conform to the provisions of this
11                 chapter.   Upon written request of the property owner, the
                  administrator shall grant one, one-year extension to the
12                 aforementioned two-year period.

13         The MCC does not define the terms "abandon" or "cease," but the parties agree

14   that abandonment requires intent to terminate and therefore dispute only whether intent is

15   required when a nonconforming use "ceases for any reason whatsoever."  Consistent with

16   the parties' interpretation of "abandonment," the Moskowitz Dictionary defines the term

17   as "[t]he relinquishment of property, or a cessation of the use of the property, by the

18   owner or lessee without any intention of transferring rights to the property to another

19   owner or of resuming the use of the property."[8]  Because the Moskowitz Dictionary does

20

21   _____

22   [8] Grump suggests that the Moskowitz Dictionary uses the terms "abandonment" and "cessation"
     interchangeably, but this is incorrect.  See Grump Petition (docket no. 25 at 26).  As opposed to

23

not define "cease," the Court turns to Black's Law Dictionary, which defines the term as "[t]o stop, forfeit, suspend, or bring to an end."  BLACK'S LAW DICTIONARY (11th ed. 2019).  Thus, while the definition for "abandonment" contains an intent element, the definition for "cease" does not.[9]

Furthermore, the addition of "for any reason whatsoever" after "ceases" suggests that the ordinance meant to encompass all instances where a party ceases its nonconforming uses and necessarily includes both intentional and unintentional reasons.  "Whenever possible, courts should avoid a statutory construction which nullifies, voids, or renders meaningless or superfluous any section or words."  Nisqually Delta Ass'n v. City of DuPont, 627 P.2d 956, 959 (Wash. 1981).  The additional language of "for any reason whatsoever" constitutes further indication that the reason for the cessation of the use is irrelevant and to read the clause otherwise would render the phrase superfluous.  Grump fails to provide any explanation for why the "any reason whatsoever" language would be included if "cessation" required intent.

Accordingly, under MCC 17.05.016, a nonconforming use can be terminated by two ways:  (1) cessation of use with intent to abandon, which can occur over any period

_____

defining the terms interchangeably, the Moskowitz Dictionary's definition of "abandonment" provides that abandonment is cessation of use coupled with intent to abandon.

[9] Grump asserts that the SM-6 Rescission did not provide notice that its nonconforming use rights could be terminated under the cessation clause because the letter stated only that "any past surface mining has been abandoned for a period of more than two years."  AR1 at 7 (SM-6 Rescission).  The letter, however, provided that it was applying MCC 17.05.016(a) and quoted the ordinance in full.  AR1 at 7 (SM-6 Rescission).  The complete recitation of MCC 17.05.016(a) constituted sufficient notice that Grump's nonconforming use rights could be terminated under either the abandonment or cessation clauses.

of time, or (2) cessation of use for any reason, which must occur for at least two years. Given the evidence that the drafters of the MCC intended to create two pathways and the deference the Court gives to the Examiner's interpretation, Grump's argument that MCC 17.05.016 being titled "Abandonment; reconstruction" suggests intent is required for cessation of use is not persuasive.[10]

No Washington Court has addressed the issue of whether MCC 17.05.016(a) requires a showing of intent for cessation of a nonconforming use. Division Two of the Washington State Court of Appeals has, however, addressed the same issue under a different ordinance. Choi v. City of Fife, 803 P.2d 1330 (Wash. Ct. App. 1991). In that case, the ordinance provided that a nonconforming use terminates when it is "*vacated or abandoned* for six consecutive months or eighteen months during any three-year period." Id. at 1331 (emphasis in original, citation omitted). Division Two noted that, under Washington law, when different words are used in the same ordinance, courts presume that a different meaning was intended for each word. Id. at 1332. Accordingly, the court interpreted "vacate" to not require an intent element so that it would have a separate meaning from "abandon," citing Black's Law Dictionary's definition of "vacate," which did not include an intent element. Id. Moreover, the Choi Court noted that an objective

---

[10] Grump additionally contends that not requiring intent to terminate a nonconforming use is inconsistent with the diminishing assets doctrine but fails to cite any authority that has so held. See Grump's Petition at 24–25. Furthermore, this argument lacks merit as the diminishing assets doctrine and the termination of nonconforming uses are two distinct concepts. The diminishing assets doctrine concerns the proper scope of a nonconforming use in an exhaustible resource. McGuire, 30 P.3d at 459. In contrast, termination addresses when an owner loses the right to engage in a nonconforming use regardless of its scope.

test is preferable as a matter of policy, because the subjective test "puts a premium on quasi-perjury" while not serving the judicial policy disfavoring nonconforming uses. Id. at 1333 (citation omitted).

Division One arguably reached a different conclusion in an older case. See Andrew v. King County, 586 P.2d 509 (Wash. Ct. App. 1978). There, Division One interpreted "discontinue" in the relevant ordinance to require proof of intent to terminate a nonconforming use. Id. at 513–14. In Andrew, however, the ordinance at issue stated, "[i]f any nonconforming use of land . . . [i]s discontinued for a continuous period of more than one year, such land or building shall not again be occupied or used except by a conforming use." Id. at 513 (citation omitted). Thus, that ordinance differed from the ones at issue in this case and in Choi because "discontinue" was used instead of "abandon," not in addition to it. Accordingly, in Andrew, Division One could interpret "discontinue" and "abandon" synonymously without rendering any terms in the ordinance superfluous and without applying the presumption that the words would have different meanings. See Clark v. Payne, 810 P.2d 931, 934 (Wash. Ct. App. 1991) (noting that a basic rule of statutory construction is that courts should construe statutes so that no portion is superfluous); Choi, 803 P.2d at 1332. For these reasons, Choi is more on point with this case.[11]

---

[11] The Court also notes that, had this case proceeded in Thurston County Superior Court, case law from Division Two would control.

Citing <u>Choi</u>, the Supreme Court of Washington has acknowledged that a zoning scheme may allow for the termination of a nonconforming use without a showing of intent. <u>McGuire</u>, 30 P.3d at 457. Other courts have similarly interpreted ordinances that terminate a nonconforming use after the running of a certain time period to eliminate the need for an intent requirement, because the running of the time period is construed as a de facto intent to abandon. 8A McQuillin, LAW OF MUN. CORP. § 25:271 (3d ed. 2020) (collecting cases). As in <u>Choi</u>, MCC 17.05.016's inclusion of the terms "abandoned" and "ceases for any reason whatsoever" demonstrate an intent to provide two pathways for nonconforming uses to terminate. The Examiner reached the same conclusion and the Court gives considerable deference. <u>Tateuchi</u>, 478 P.3d at 149. The Court concludes that the Examiner did not err by interpreting MCC 17.05.016 to not require proof of intent for cessation of nonconforming uses.

## C. Substantial Evidence

Grump asserts that, even if the Examiner correctly interpreted the law, his finding that Grump ceased mining operations for two years is not supported by substantial evidence. Substantial evidence is evidence sufficient to persuade a reasonable person that the declared premise is true. <u>Phoenix Dev</u>, 256 P.3d at 1154. When reviewing a substantial evidence challenge, the Court must view the facts and inferences in the light most favorable to the prevailing party. <u>See id.</u> at 1155. Additionally, reviewing courts do not weigh the evidence or substitute their judgments for those of the factfinder. <u>Id.</u> Rather, reviewing courts "defer to the hearing examiner's assessment of the credibility of witnesses and the weight to be given reasonable but competing inferences." <u>Friends of</u>

Cedar Park Neighborhood v. City of Seattle, 234 P.3d 214, 218 (Wash. Ct. App. 2010) (citation omitted).

When reaching his decision that Grump had not engaged in mining between April 3, 2017, and April 3, 2019, the Examiner relied on expert testimony from Rick Glenn. AR8 at 127–30 (Final Decision). Although Grump asserts that Glenn's testimony was not reliable, the Examiner acknowledged the flaws in Glenn's testimony and still found it to be credible. AR8 at 128–29 (Final Decision). The Examiner additionally noted that testimony from neighbors living near or adjacent to the Property corroborated much of Glenn's testimony. AR8 at 129 (Final Decision). Although it was unclear whether Glenn's observations extended to April 2019, the Examiner ultimately found that the combination of Glenn's testimony, the neighbors' testimony, and the historical infrequency of mining established, on a more likely than not basis, that no mining occurred in the two-year period, and that Grump's evidence failed to overcome the evidence of lack of mining. AR8 at 140 (Final Decision).

Grump also claims that its evidence was uncontroverted, but the Examiner did not find its witnesses to be credible and determined their testimony was contradicted by other evidence, namely aerial pictures of the Property and testimony from neighbors. AR8 at 118–19, 129–30, 137–38 (Final Decision). The Examiner was particularly troubled by the fact that none of Grump's evidence was independently verifiable and characterized Grump's evidence as "highly dubious." AR8 at 134 (Final Decision). Moreover, other witnesses testified to the operational and economic infeasibility of the mining that Grump asserted it had done in April 2017, which the Examiner found persuasive. AR8 at 135–

37 (Final Decision).  Similarly, the Examiner found that Grump's evidence on test pits was not reliable because digging test pits in the middle of a road was not industry standard and the area where the test pits were allegedly dug was impassable due to overgrowth.  AR8 at 138–39 (Final Decision).

Ultimately, Grump's arguments on this point go to the credibility and the weight of the evidence, on which the Court defers to the Examiner's assessments.[12]  Given the testimony about the lack of mining at the Property from Glenn and multiple neighbors, the Court concludes that substantial evidence supports the Examiner's Final Decision.

**D. Constitutional Violations**

Lastly, Grump contends that the Examiner's Final Decision violated its constitutional rights.  Specifically, Grump argues that the County's failure to notify Grump that it was considering rescinding the SM-6 and the Examiner being biased violated its rights to due process under the Washington and United States Constitutions.[13]

Regarding notice, to state a claim for procedural due process, Grump must establish that it had a protectable property interest in the SM-6 and, if so, that it was denied this property right without the process that was due under the circumstances.  See

---

[12] Grump also asserts that the Examiner improperly shifted the burden of proof because he ignored Grump's undisputed evidence of mining.  Grump Petition at 27.  But other testimony contradicted Grump's evidence, and the Examiner did not find Grump's evidence to be credible. AR8 at 118–19, 129–30, 137–38 (Final Decision).  As opposed to improperly shifting the burden to Grump, the Examiner recognized in both his Order on Motions for Second Summary Judgment and his Final Decision that the County had the burden to establish termination of the nonconforming use.  See AR2 at 227–28 (Order 2); AR8 at 117 (Final Decision).

[13] These due process clauses are coextensive.  Nielsen v. Wash. State Dep't of Licensing, 309 P.3d 1221, 1225 n.5 (Wash. Ct. App. 2013).

Bateson v. Geisse, 857 F.2d 1300, 1305 (9th Cir. 1988).  Courts assess due process claims by considering the private interest affected, the government's interest, and the value added by additional or substitute procedural safeguards in the situation before the court.  Mathews v. Eldridge, 424 U.S. 319, 335 (1976).

Even assuming Grump has a property interest in the SM-6, its due process claim fails.  As an initial point, because the Court affirms the Examiner's conclusion that Grump's nonconforming use rights terminated in April 2019, the SM-6 Rescission, which the County issued on January 28, 2020, did not affect Grump's property rights.  Additionally, Grump asserts that the County's failure to provide notice that it was considering rescinding the SM-6 or state its reasons for doing so deprived it of due process, but the appellate process provided for in MCC 15.11, including an appeal before a hearing examiner followed by judicial review, provides sufficient process under the circumstances.  In the review process, Grump had the opportunity to make its arguments before the Examiner with witnesses, legal briefing, and a four-day hearing.  Indeed, no notice or hearing is required for the issuance of an SM-6, and the SM-6 Rescission explained that the County based its decision on its determination that Grump's nonconforming use rights had terminated under MCC 17.05.016.  Finally, Grump's claim that the Examiner was not an impartial decision maker lacks basis in the record.  The Examiner's orders on summary judgment and Final Decision thoughtfully explained the legal analysis behind his decisions and demonstrated that they are grounded in the law.

**Conclusion**

For the foregoing reasons, the Court ORDERS:

1      (1)    Grump's Petition, docket no. 25, is DENIED;

2      (2)    The Court AFFIRMS the Examiner's Final Decision, docket no. 19-8 at

3  116–45, and DISMISSES this case with prejudice;

4      (3)    The parties shall file a Joint Status Report by June 18, 2021, advising the

5  Court whether any matter remains under the second phase of the case, <u>see</u> Order Granting

6  Joint Motion to Consolidate Cases and Bifurcate Claims (docket no. 17), or whether

7  Judgment can be entered consistent with this Order.

8      (4)    The Clerk is directed to send a copy of this Order to all counsel of record.

9  IT IS SO ORDERED.

10  Dated this 7th day of June, 2021.

Thomas S. Zilly
United States District Judge